## A10A0869. PENDLEY et al. v. SOUTHERN REGIONAL HEALTH SYSTEM, INC.

(704 SE2d 198)

DOYLE, Judge.

Linda Pendley, individually and on behalf of the estate of Mark Pendley, her son, brought the instant medical malpractice action against various parties, including Southern Regional Health System, Inc., d/b/a Southern Regional Medical Center ("Southern Regional"). Pendley appeals the trial court's order granting summary judgment to Southern Regional as well as the trial court's order granting Southern Regional's motion in limine to exclude expert testimony of Dr. Jonathan Ilowide. For the reasons that follow, we affirm.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.[1]

Furthermore,

> the burden on the moving party may be discharged by pointing out by reference to the affidavits, depositions and other documents in the record that there is an absence of evidence to support the nonmoving party's case. If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue.[2]

So viewed, the evidence establishes that decedent Mark Pendley arrived at the emergency room of Southern Regional on November 29, 2003, complaining of nausea and abdominal pain. Mark was examined by Dr. William Watkins, who deposed that Mark's blood sodium level was very low, close to the point at which seizures could occur, and he had exhibited tachycardia and hypotension, but Dr. Watkins's evaluations had not produced a diagnosis for the cause of the symptoms. Dr. Watkins also ordered a series of further tests in an

---

[1] (Punctuation omitted.) *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).

[2] (Punctuation omitted.) *Ellison v. Burger King Corp.*, 294 Ga. App. 814, 819 (3) (a) (670 SE2d 469) (2008).

attempt to discover the cause of Mark's abdominal pain, and in the early morning of November 30, Dr. Watkins determined that Mark should be admitted to the telemetry floor.

That morning, Dr. Watkins discussed Mark's case with Dr. Cashmir C. Okoro, and Dr. Watkins's order for admission stated "Admit to telemetry. Diagnosis: Abdominal pain, hypotension, electrolyte imbalance. Attending Dr. Okoro. Condition: Fair. . . . Call Dr. Okoro on arrival of the patient to the floor for further orders." After Dr. Watkins's discussion with Dr. Okoro some time after 6:20 a.m. on November 30, an emergency room nurse noted in the Intra-Hospital Transfer section of the emergency room records that Mark's blood pressure was 79/49; the Transfer section states that it is to be completed (including recording various vital signs such as blood pressure of the patient) within 30 minutes of a patient's transfer, which occurred in this case at 8:00 a.m. on November 30. Dr. Okoro deposed that he reviewed these records prior to examining Mark. The nurse's notes do not indicate whether this blood pressure reading was orally communicated to any physician.

On the afternoon of December 1, Dr. Okoro examined Mark. Early on the morning of December 2, Mark's condition deteriorated, and he passed away.

Dr. Ilowide, who practices in pulmonary and critical care and who testified as Pendley's expert witness, deposed that his practice employs two registered nurses and a nurse practitioner. Dr. Ilowide deposed that he annually conducted continuing education classes for nurses at Winthrop University Hospital. Dr. Ilowide also specifically deposed that he (1) never trained or practiced as a nurse, (2) did not regularly train or supervise nurses outside of writing orders that nurses then carried out, (3) was not an expert in the nursing field, and (4) was not an expert as to the standard of care of nurses. Dr. Ilowide deposed that based on the medical record, his education and experience, and Dr. Okoro's deposition, he believed Mark died after suffering from sepsis or an idiopathic problem, which led to acute respiratory distress syndrome, which was apparent while he was still in the emergency room and escalated into the full-blown syndrome while he was in telemetry. He concluded that an "institutional failure" occurred when Mark was not admitted to the intensive care unit ("ICU") because of his deterioration during his emergency room stay, and had Mark been admitted to the ICU, he likely would have survived.

Dr. Ilowide deposed that he did not "have [any] specific criticisms" of the nursing care provided to Mark; he also deposed that the nurse who noted in Mark's records the blood pressure reading of 79/49 should have orally communicated the reading to the treating

physician because it was so abnormal, but he agreed with defense counsel's statement that he could not say any particular failure on the part of a nurse involved in Mark's care was a breach of the standard of care. Dr. Ilowide also deposed that Dr. Okoro breached the standard of care by allowing Mark to be admitted to telemetry instead of the ICU and by not transferring Mark from telemetry to the ICU while Dr. Okoro treated him during the following hours.

Southern Regional submitted the affidavit of Susan A. Nemchik, director of risk management, which stated that (1) Dr. Okoro does not have an employment contract with Southern Regional; (2) Southern Regional did not exercise control over the manner in which Dr. Okoro rendered care for his patients; (3) Southern Regional did not provide medical malpractice insurance for Dr. Okoro; (4) Southern Regional did not directly compensate Dr. Okoro for services rendered to Mark; and (5) Southern Regional did not bill for Dr. Okoro's services. Dr. Okoro's affidavit provided that at the time of Mark's death, Dr. Okoro was a shareholder, member, and employee of Southside Internal Medicine, P.C. In addition to stating that he maintained a separate practice from Southern Regional, Dr. Okoro's affidavit stated that he (1) maintained his own insurance and (2) billed patients separately from Southern Regional for services rendered at the hospital. Dr. Okoro's affidavit maintains that he never stated to Pendley or Mark that he was an employee of Southern Regional. Moreover, Pendley, on behalf of Mark, signed two documents, a "General Consent for Treatment" and a "Routine Consent," each of which stated that all physicians providing treatment at Southern Regional were independent contractors and not employees of Southern Regional.

In its order, the trial court determined that Dr. Okoro was not an employee of Southern Regional, and Pendley had no reason at the time of Mark's admission to believe that Dr. Okoro was employed at Southern Regional. Additionally, the trial court concluded that Dr. Ilowide's testimony should be excluded as to the standard of care of nurses because he did not meet the requirements of OCGA § 24-9-67.1 (c) (2) (D). The trial court also concluded that, even if Dr. Ilowide's testimony was admissible, Pendley had failed to present evidence that any alleged breach of the standard of care of the nurses treating Mark was the proximate cause of Mark's death. Based on those findings, the trial court granted summary judgment on Pendley's claims to Southern Regional.

1. Pendley argues that the trial court erred by granting summary judgment to Southern Regional based on the alleged negligence of Dr. Okoro.

(a) First, Pendley argues that the trial court erred by granting Southern Regional's motion for summary judgment on its finding that Dr. Okoro was not an employee of Southern Regional.

> [F]or the hospital to be held liable [for the acts of a doctor,] it must be shown that the doctor was an employee of the hospital and not an independent contractor. The true test of whether the relationship is one of employer-employee or employer-independent contractor is whether the employer, under the contract either oral or written, assumes the right to control the time, manner[,] and method of executing the work, as distinguished from the right merely to require certain definite results in conformity to the contract.[3]

Because the cause of action here arose prior to February 16, 2005, we apply the factors set forth in *Cooper v. Binion*,[4] in order to determine whether Pendley has submitted sufficient evidence to show that there is a question of fact as to whether Dr. Okoro was an employee of Southern Regional. These factors are:

> (a) The right to direct the physician's work step-by-step[;] . . . (b) Contracts to perform a service rather than accomplish a task[;] . . . (c) The right of the hospital to inspect the physician's work[;] . . . (d) The supplier of the equipment[;] . . . (e) The nature or skill of the physician's work[;] . . . (f) The hospital's right to control the physician's time[;] . . . (g) The method of payment[;] . . . (h) [The r]ight to choose which patients to treat[;] . . . (i) Physician spends all working hours at hospital[;] . . . (j) The method of billing the patients[; and] . . . (k) Payments for medical malpractice insurance.[5]

Specifically, Pendley contends that the trial court erred by granting summary judgment on the question of whether Dr. Okoro was an employee because (1) Southern Regional exercised control

---

[3] (Punctuation omitted.) *Cooper v. Binion*, 266 Ga. App. 709, 710 (1) (598 SE2d 6) (2004), superceded by statute as stated in *Blackmon v. Tenet Healthsystem Spalding*, 288 Ga. App. 137, 139, n. 7 (653 SE2d 333) (2007) (noting that "in 2005, the Georgia legislature enacted OCGA § 51-2-5.1 (f) and (g), which effectively superseded *Lee* and *Cooper* by allowing the language of the contract to control and, where a contract was absent, unclear or ambiguous, by announcing new factors and by eliminating many of the old eleven factors in making this determination. The legislature specified, however, that this new Code section would only apply to causes of action arising on or after February 16, 2005."). (Punctuation omitted.)

[4] 266 Ga. App. at 710-713 (1).

[5] (Emphasis omitted.) Id. at 710-713 (1) (a)-(k).

over Dr. Okoro's time and schedule for working at the hospital, and (2) Southern Regional supplied equipment to Dr. Okoro. Dr. Okoro deposed that at the time he treated Mark, he had been on call for Southern Regional for the preceding 24 hours and was required to be the admitting doctor on November 29 and 30. He also deposed that he utilized the hospital dictation equipment when recording his notes on hospital patients, and he does not maintain separate files for those patients in his private practice. Dr. Okoro also deposed that when a physician has privileges at a hospital, the physician undertakes certain tasks, such as seeing a certain number of patients.

We do not find that Pendley has supplied sufficient facts to overcome Southern Regional's motion for summary judgment. In addition to the affidavit of Nemchik, which stated that Southern Regional did not employ, directly compensate, bill patients on behalf of, provide insurance for, or exercise control over the methods of Dr. Okoro, Dr. Okoro stated he was not employed by Southern Regional and maintained his own separate practice. And while Dr. Okoro deposed that he had been on call for 24 hours at the time of Mark's admission, and he was the admitting physician "by [7:00] in the morning" and that as an attending physician with privileges he undertook certain obligations, the record is devoid of evidence that Southern Regional controlled the time at which Dr. Okoro was required to perform at the hospital.[6] Neither Nemchik's nor Dr. Okoro's affidavit states whether Southern Regional maintained control of Dr. Okoro's schedule, and neither witness states whether Dr. Okoro dictated the dates upon which he could work or if Southern Regional dictated when Dr. Okoro was required to work during a given time period.[7] This does not meet Pendley's burden of identifying specific evidence giving rise to a triable issue with respect to Dr. Okoro's status as an employee of Southern Regional, because "speculation which raises merely a conjecture or possibility is not sufficient to create even an inference of fact for consideration on summary judgment."[8] Stated plainly, the fact that Dr. Okoro used the hospital's dictation equipment or that he was scheduled to be at

---

[6] *Brown v. Coastal Emergency Svcs.*, 181 Ga. App. 893, 896 (2) (354 SE2d 632) (1987) (applying law to two emergency room physicians). See also *Cooper*, 266 Ga. App. at 711 (1) (f) ("Where the hospital requires the physician to work certain hours or arranges the physician's schedule, this factor shows that the physician is an employee and may alone preclude summary judgment.").

[7] Compare *Hollingsworth v. Ga. Osteopathic Hosp.*, 145 Ga. App. 870, 871-872 (245 SE2d 60) (1978) (holding that summary judgment was improper when evidence showed that the hospital required physician to work certain hours at least once a month); with *Williamson v. Coastal Physician Svcs. of the Southeast*, 251 Ga. App. 667, 670 (554 SE2d 739) (2001) (holding that it was appropriate to grant summary judgment to a hospital when evidence showed that physician controlled own time by informing hospital when he would be available to work).

[8] (Punctuation omitted.) *Ellison*, 294 Ga. App. at 819 (3) (a).

the hospital on the day Mark was admitted is simply not enough to create an issue of fact as to whether the hospital controlled Dr. Okoro's time, method, or manner of work to the degree that he should be considered an employee of Southern Regional.[9] Accordingly, we affirm the trial court's grant of summary judgment on this issue.

(b) Next, Pendley argues that the trial court erred by granting Southern Regional's motion for summary judgment on the basis that Dr. Okoro was not an apparent or ostensible agent of Southern Regional. We disagree.

> The doctrine of apparent or ostensible agency provides: One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.[10]

Relying on *Cooper*, Pendley contends that there is a question of fact as to whether Southern Regional represented that Dr. Okoro was an agent of the hospital. When Mark arrived at Southern Regional without a physician, neither Pendley nor Mark selected Dr. Okoro for treatment Mark would receive at the hospital, and Pendley claimed that she selected Southern Regional for Mark's treatment based on the hospital's reputation and not on the reputation of Dr. Okoro. In *Cooper*, however, the physician in question told the plaintiffs "he could not be their private doctor inasmuch as he had no private practice and did not see patients outside of the hospital's emergency room."[11] There is nothing in our record to indicate that Dr. Okoro made any statement to Pendley from which she could conclude he was an employee of the hospital.

Pendley also contends that the waiver forms were defective on their face because they excepted physicians from Southern Crescent Physicians Group and Southern Crescent Behavioral Medicine from the disclaimer that physicians were not employees or agents of

---

[9] Compare with *Cooper*, 266 Ga. App. at 710-713 (1) (a)-(k) (listing numerous factors which could show that the hospital in question controlled the physician's time, method, or manner of work, including facts that the hospital billed patients on behalf of the physician, provided him with insurance, and controlled his scheduling); *Hollingsworth*, 145 Ga. App. at 871-872 (in response to the summary judgment motion, plaintiff presented evidence that hospital controlled physician's scheduling).

[10] (Punctuation omitted.) *Cooper*, 266 Ga. App. at 714 (2) (physical precedent only). See *Richmond County Hosp. Auth. v. Brown*, 257 Ga. 507, 508 (361 SE2d 164) (1987).

[11] *Cooper*, 266 Ga. App. at 714 (2).

Southern Regional. There are no facts in the record, however, to suggest that Pendley believed she was utilizing the services of either of those groups. Mark was seen in the emergency department and later admitted to the telemetry floor, and the disclaimers state that all other departments of the hospital are staffed by independent contractor physicians. In *Cooper*, we found that the hospital failed to call attention to the acknowledgment of physician independent contractors.[12] Here, however, Southern Regional bolded the independent contractor disclaimers in both the General Consent for Treatment and the Routine Consent, and the Routine Consent also cautioned readers in bold: "Important: Do not sign this form without reading and understanding its contents."[13]

Pretermitting whether a question of fact may remain as to the conspicuousness of the signage posted by Southern Regional based on Pendley's averment that she did not recall seeing them,[14] the conspicuous disclaimers in the General Consent for Treatment and the Routine Consent as well as the lack of any evidence of record that Dr. Okoro held himself out as Southern Regional's employee support the trial court's grant of summary judgment to Southern Regional on this issue.

2. Pendley contends that the trial court erred by granting summary judgment to Southern Regional based on the alleged negligence of the nursing staff. We disagree and affirm as to this issue.

Pretermitting whether there was a failure of causation apparent in the record, we cannot conclude that the trial court abused its discretion by finding that Dr. Ilowide was not qualified to testify as an expert on whether any member of the nursing staff breached the standard of care pursuant to OCGA § 24-9-67.1 (c) (2) (D).[15]

To be qualified to render an opinion in a professional malpractice action, an

> expert's knowledge and experience [must be] relevant to the acts or omissions that the plaintiff alleges constituted malpractice and caused the plaintiff's injuries. But a mini-

---

[12] See id.

[13] See id.

[14] See id. at 714 (2).

[15] OCGA § 24-9-67.1 (c) (2) (D) provides:
Notwithstanding any other provision of this Code section, an expert who is a physician and, as a result of having, during at least three of the last five years immediately preceding the time the act or omission is alleged to have occurred, supervised, taught, or instructed nurses, . . . has knowledge of the standard of care of that health care provider under the circumstances at issue shall be competent to testify as to the standard of that health care provider. . . .

mum level of knowledge in the area in which the opinion is to be given is insufficient; instead, an expert must be both familiar with the standard of care at issue *and* also demonstrate specific experience in the relevant practice area.[16]

Dr. Ilowide deposed that he did not train or practice as a nurse, did not train nurses, did not supervise nurses outside of normal nurse-physician interactions, and did not hold himself out to be an expert in nursing or in the standard of care of nurses. Although Dr. Ilowide deposed that his private practice employed nurses and that it was his opinion that the nurse who recorded Mark's blood pressure reading of 79/49 on the morning of November 30 should have also orally informed a physician of that reading, we cannot say that under these circumstances the trial court abused its discretion by granting Southern Regional's motion to exclude Dr. Ilowide's testimony.[17]

*Judgment affirmed. Andrews, P. J., and Ellington, J., concur.*

DECIDED NOVEMBER 24, 2010.

*Donald W. Johnson*, for appellants.
*Greenberg Traurig, Lori G. Cohen, R. Scott Campbell, Paul E. Weathington, Stanley P. Riepe*, for appellee.

---

[16] (Citation and punctuation omitted; emphasis supplied.) *Dawson v. Leder*, 294 Ga. App. 717, 719 (1) (669 SE2d 720) (2008).

[17] See id. at 719-720 (1).