A11A1927. MEDICAL STAFFING NETWORK, INC.
v. CONNORS et al.
(722 SE2d 370)

ELLINGTON, Chief Judge.

Janet Rowland, the widow of William Rowland, and the estate of William Rowland (collectively, "the Rowlands") brought this medical malpractice action in the State Court of DeKalb County against DeKalb Medical Center ("the hospital") and Medical Staffing Network, Inc., a temporary staffing agency.[1] The hospital filed a cross-claim for indemnification against Medical Staffing, which employed a nurse whose negligence allegedly injured William Rowland and caused his death. A jury trial resulted in a verdict in favor of the Rowlands. Ultimately, the trial court entered judgment in favor of the Rowlands on the jury's verdict and in favor of the hospital on its

---

[1] Debra Connors and Melinda McCune, Janet Rowland's representatives, filed suit on her behalf.

cross-claim. Medical Staffing appeals, challenging the judgment along with the trial court's rulings on a number of post-trial motions.

The following facts are undisputed. In July 2005, William Rowland was seriously injured in a vehicular accident and received long-term acute care at the hospital. At the time, Medical Staffing was under contract with the hospital to supply the hospital with temporary medical personnel as needed. Peggy Howard, a licensed practical nurse employed by Medical Staffing, worked the overnight shift from 7:00 p.m. on August 13 to 7:00 a.m. on August 14, 2005, and was primarily responsible for William Rowland's care that night. William Rowland developed hypotension (low blood pressure) that night, but Howard did not discover his worsening condition until she checked on him at 5:20 a.m.

The Rowlands brought suit against the hospital on December 7, 2007, claiming that Howard negligently failed to monitor William Rowland's vital signs and that, as a result of the delay in treatment, he suffered injuries, including severe brain damage, which resulted in his death on December 8, 2005. They added Medical Staffing as a party defendant in March 2008.

In her deposition, Howard testified that a nursing assistant was responsible for taking her patients' blood pressure and reporting the results to her. According to Howard, the delay in treatment was the nursing assistant's fault because he failed to inform her of William Rowland's low blood pressure readings. Tyrone Ogburn, an employee of the hospital, was identified as that nursing assistant.

The hospital stipulated that Howard was its apparent agent and, therefore, that it was liable if she committed malpractice. In addition, Medical Staffing stipulated that, pursuant to an indemnity provision in its staffing contract with the hospital,[2] Medical Staffing would be responsible for any damages the jury awarded the Rowlands to the extent the jury apportioned the fault to Howard.

The trial court submitted the case to the jury using a special verdict form. The jury found that both Howard and Ogburn were negligent and that their negligence proximately caused William Rowland's injury and death. The jury apportioned fault 95 percent to Howard and 5 percent to Ogburn. The jury awarded the estate $364,279.40 for William Rowland's medical bills and $1 million for his pain and suffering and awarded Janet Rowland $2.5 million on her wrongful death claim.

1. Medical Staffing contends that the trial was fundamentally

---

[2] The agreement between the hospital and Medical Staffing provided: "[Medical Staffing] agrees to indemnify and hold harmless [the hospital] . . . from claims and liabilities . . . relating to any property damage, personal injuries, or death . . . arising out of its acts or omissions of [Medical Staffing] in connection with [its] duties and services provided under this agreement."

unfair because the Rowlands and the hospital concealed until after the verdict that, on the first day of trial, they had entered into an agreement which allowed the hospital to reduce or eliminate its financial exposure in exchange for certain conduct during the litigation that would increase Medical Staffing's liability. As a result, Medical Staffing contends, the trial court erred in denying its motion for a new trial based on the existence of the secret litigation agreement.

A trial court may grant a new trial

> in any case where any material evidence, not merely cumulative or impeaching in its character but relating to new and material facts, is discovered by the applicant after the rendition of a verdict against him and is brought to the notice of the court within the time allowed by law for entertaining a motion for a new trial.

OCGA § 5-5-23. To satisfy this standard, the applicant must show, inter alia, that the newly discovered evidence "was so material as to make a different verdict likely[.]" (Citation omitted.) *Flowers v. Union Carbide Corp.*, 271 Ga. App. 438, 443 (3) (b) (610 SE2d 109) (2005). "The grant or denial of a new trial on the ground of newly discovered evidence is not favored and is addressed to the trial court's sound discretion." (Footnote omitted.) *Gill v. Spivey*, 264 Ga. App. 723, 724 (1) (592 SE2d 132) (2003). Accordingly, "[a] trial court's denial of a motion for new trial on the ground of new evidence will not be reversed absent an abuse of discretion." (Citation omitted.) *Flowers v. Union Carbide Corp.*, 271 Ga. App. at 443 (3) (b).

The record shows that the agreement the Rowlands and the hospital executed on the first day of trial provided as follows:

(1) In the event of a verdict against the Rowlands and in favor of the hospital, the hospital would pay the Rowlands $50,000.

(2) In the event of a verdict in favor of the Rowlands and against the hospital, the hospital would diligently pursue its cross-claim against Medical Staffing and, if it prevailed, it would pay the Rowlands the amount it recovered from Medical Staffing. The Rowlands agreed, in that event, not to enforce the remainder of the judgment (if any) against the hospital.

(3) In the event of a verdict in favor of the Rowlands and against the hospital, and in the event the hospital failed to prevail on its cross-claim against Medical Staffing, the hospital agreed to pay the Rowlands $50,000 if the verdict was $50,000 or less; the amount of the verdict, if the verdict was more than $50,000 but less than $100,000; or $100,000, if the verdict was $100,000 or more. Again, the Rowlands agreed not to enforce the remainder of the judgment

against the hospital.

Thus, the Rowlands were assured of receiving at least $50,000, and the hospital's ultimate financial exposure was limited to $100,000.

Medical Staffing contends that

> [t]he sole purpose of this secret Agreement was to avoid liability of [the hospital] and to obtain an inflated damages verdict against [Medical Staffing], so that [the hospital] could later collect on the verdict *as the fiduciary for [the Rowlands]*, and based on an indemnification theory against [Medical Staffing], give the monies to [the Rowlands], $2,500,000 of which was actually barred against [Medical Staffing] because the statute of limitation[ ] on the wrongful death claim had expired [before the Rowlands amended their complaint to add Medical Staffing as a party defendant]. The Agreement smacks of such questionable contractual obligations that [the Rowlands] and [the hospital] had an affirmative duty to voluntarily disclose the Agreement to [Medical Staffing] and to the Trial Court[.]

(Emphasis in original.)[3]

First, we note that the fact that the statutory limitation period expired before the Rowlands asserted the wrongful death claim

---

[3] Medical Staffing likens this agreement to so-called "Mary Carter" agreements, which derive their name from the case of *Booth v. Mary Carter Paint Co.*, 202 S2d 8 (Fla. 2d Dist. Ct. App. 1967). As the Supreme Court of Florida has explained,

> [a] "Mary Carter Agreement" . . . is basically a contract by which one codefendant secretly agrees with the plaintiff that, if such defendant will proceed to defend himself in court, his own maximum liability will be diminished proportionately by increasing the liability of the other co-defendants. Secrecy is the essence of such an arrangement, because the court or jury as trier of the facts, if apprised of this, would likely weigh differently the testimony and conduct of the signing defendant as related to the non-signing defendants. By painting a gruesome testimonial picture of the other defendant's misconduct or, in some cases, by admissions against himself and the other defendants, he could diminish or eliminate his own liability by use of the secret "Mary Carter Agreement." Concluding that such agreements tend to mislead judges and juries and border on collusion, [the court held in *Booth v. Mary Carter Paint Co.*] that they must be produced for examination before trial if sought to be discovered under appropriate rules of procedure and should be admitted into evidence at trial upon the request of any other defendant who may stand to lose as a result of the agreement.

(Citation and punctuation omitted.) *Dosdourian v. Carsten*, 624 S2d 241, 242-243 (Fla. 1993). Some states, including Florida, have outlawed such agreements on the basis that they tend to undermine the adversarial process, while others have adopted rules to ameliorate those effects, such as requiring that such agreements must be disclosed to nonsettling co-defendants and to the court and may be admitted into evidence. See analysis and cases collected in Christopher Vaeth, "Validity and Effect of 'Mary Carter' or Similar Agreement Setting Maximum Liability of One Cotortfeasor and Providing for Reduction or Extinguishment Thereof Relative to Recovery Against Nonagreeing Cotortfeasor," 22 ALR5th 483 (Originally published in 1994,

against Medical Staffing did not shield it from those damages, given that the claim was timely as to the hospital, which was derivatively liable for Howard's negligence on the basis of apparent agency,[4] and that Medical Staffing was contractually obligated to indemnify the hospital for any claims and liabilities relating to Howard's acts and omissions. See Division 4, infra.

Furthermore, we agree with the trial court's conclusion that there is nothing in the record to show that Medical Staffing's ignorance of the litigation agreement rendered the trial fundamentally unfair. Under the circumstances, the primary jury issue as to liability was the apportionment of fault. Because Medical Staffing had a contractual obligation to indemnify the hospital for any damages it had to pay on account of Howard's negligence, the hospital had an obvious incentive from the outset to try to show that the Rowlands' damages were entirely Howard's fault, rather than solely or partly the fault of the hospital's own employee. Both the Rowlands and the hospital freely disclosed this alignment of their interests to the jury during opening statements. Further, even if the Rowlands benefitted from the hospital's efforts to enforce its right to indemnity, such incidental benefit did not make the hospital the Rowlands' agent.[5] Under the circumstances of this case, we conclude that the trial court could reasonably find that, even if the Rowlands and the hospital had disclosed their litigation agreement during trial, it is unlikely that the jury would have reached a different verdict. Thus, pretermitting whether Georgia law should limit agreements of this nature, we find no abuse of discretion in the trial court's denial of Medical Staffing's motion for a new trial based on the failure of the Rowlands and the hospital to spontaneously disclose their litigation agreement to Medical Staffing and the court. *Gill v. Spivey*, 264 Ga. App. at 724 (1).

---

updated 2011); *Dosdourian v. Carsten*, 624 S2d at 245-248 (rejecting the "disclosure and admission approach" and declaring Mary Carter agreements to be void as against public policy).

[4] The doctrine of apparent or ostensible agency provides [that] [o]ne who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

(Punctuation and footnote omitted.) *Pendley v. Southern Regional Health System*, 307 Ga. App. 82, 87 (1) (b) (704 SE2d 198) (2010).

[5] See OCGA § 10-6-1 ("The relation of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf."); *Harvey v. Bank One*, 290 Ga. App. 55, 57 (1) (658 SE2d 824) (2008) ("The distinguishing characteristic of an agent is that he is vested with authority, real or ostensible, to create obligations on behalf of his principal, bringing third parties into contractual relations with him.") (citation and punctuation omitted).

2. In a related argument, Medical Staffing contends the trial court abused its discretion in denying its post-trial motion to compel the production of any ancillary documents addressing the formation of the litigation agreement between the Rowlands and the hospital. "[A] trial court's decision on a discovery matter will not be disturbed unless a clear abuse of discretion is shown. Also, to prevail on appeal, [Medical Staffing] must show that the alleged error was harmful." (Punctuation and footnote omitted.) *Bd. of Regents &c. v. Ambati*, 299 Ga. App. 804, 812 (4) (b) (685 SE2d 719) (2009).

Pretermitting whether Medical Staffing's discovery request was procedurally valid, the record shows that Medical Staffing already had a copy of the written litigation agreement when it filed its motion to compel. Further, the record shows that the litigation agreement contained a merger clause, providing:

> This Agreement constitutes the entire agreement between the parties and is intended to supersede any prior discussions, agreements, or understandings between the parties on this subject matter. . . . There are no promises, representations, or agreements between the parties other than as set forth herein.

Given that the document contained the entire litigation agreement, any ancillary documents addressing the formation of the agreement could be expected to shed little, if any, light on the issue of whether the post-trial disclosure of the agreement warranted a new trial. See Division 1, supra. We find no abuse of discretion in the trial court's denial of Medical Staffing's motion to compel. *Bd. of Regents &c. v. Ambati*, 299 Ga. App. at 812 (4) (b).

3. Before the trial court entered judgment on the jury's verdict, the parties negotiated a settlement and executed a written agreement. The Rowlands later filed a motion to declare that the post-trial settlement agreement was rescinded, and Medical Staffing filed a motion to enforce and enter judgment on that settlement agreement. After the hearing on the parties' post-trial motions, the trial court determined that Medical Staffing had materially breached the post-trial settlement agreement and that the Rowlands had, with authority, rescinded the agreement. Based on this determination, the trial court granted the Rowlands' motion and denied Medical Staffing's motion. Medical Staffing appeals from the denial of its motion to enforce the settlement agreement.

The stated purpose of the settlement agreement was "to provide for certain payments in full settlement and discharge of all claims against [Medical Staffing and the hospital] which [were], or might have been, the subject matter of the [Rowlands'] Complaint."

Medical Staffing agreed to pay the Rowlands $919,314.85, as well as reimbursing Medicare $130,685.15 (a total of $1,050,000), and the hospital agreed to pay the Rowlands $100,000. Within two weeks of executing the agreement, however, Medical Staffing informed the Rowlands that it was not going to pay as promised and tendered two checks from its insurer, $131,461.92 payable to the Rowlands and $130,685.15 payable to Medicare. The Rowlands immediately notified Medical Staffing and the hospital that they were rescinding the settlement agreement due to Medical Staffing's refusal to honor it.

Generally, one injured by a breach of a contract

> has the election to rescind or continue under the contract and recover damages for the breach. But to justify rescission, there must be a material nonperformance or breach by the opposing party. If the breach is not material, the party is limited to a claim for damages and cannot rescind the contract. A breach is material when it is so substantial and fundamental as to defeat the object of the contract. In other words, to trigger the right to rescission, the act failed to be performed must go to the root of the contract. A breach which is incidental and subordinate to the main purpose of the contract does not warrant termination.

(Citation and punctuation omitted.) *Vidalia Outdoor Products v. Higgins*, 305 Ga. App. 836, 837-838 (701 SE2d 217) (2010). See also OCGA §§ 13-4-62 ("A party may rescind a contract without the consent of the opposite party on the ground of nonperformance . . . when both parties can be restored to the condition in which they were before the contract was made."); 13-4-20 ("Performance [of a contract], to be effectual, must be . . . completed within a reasonable time.").

In this case, as the trial court found, it is undisputed that, shortly after Medical Staffing entered into the settlement agreement, it announced that it would not make the payments it had agreed to make. Because the entire purpose of the contract was the exchange of certain sums for a release from liability, the trial court did not err in ruling that the Rowlands had, with authority, rescinded the post-trial settlement agreement and in denying Medical Staffing's motion to enforce and enter judgment on the agreement. See *Vidalia Outdoor Products v. Higgins*, 305 Ga. App. at 837-838; *Lanier Home Center v. Underwood*, 252 Ga. App. 745, 746 (1) (557 SE2d 76) (2001).

4. Medical Staffing contends that the trial court erred in granting the hospital's motion for entry of judgment in its favor on its cross-claim. Specifically, it contends that the hospital essentially

conceded the Rowlands' case, in terms of the standard of care, Howard's breach of that standard, apparent agency, causation, and the amount of damages, and, therefore, that the judgment the hospital suffered is a voluntary payment, which constitutes a waiver of the hospital's right to indemnity, citing *GAF Corp. v. Tolar Constr. Co.*, 246 Ga. 411 (271 SE2d 811) (1980). In addition, Medical Staffing contends that, because Janet Rowland was barred by the statute of limitation from asserting a wrongful death claim against it, it cannot be required to indemnify the hospital for that claim. Finally, Medical Staffing contends that the litigation agreement capped the hospital's liability at $100,000 and, therefore, that the maximum amount the hospital is entitled to collect against Medical Staffing is $100,000. We apply the plain legal error standard of review to the question of whether the trial court correctly entered judgment on the cross-claim. *State Farm &c. Ins. Co. v. Wright*, 245 Ga. App. 493, 494 (538 SE2d 147) (2000).

(a) *GAF Corp. v. Tolar Constr. Co.* does not support Medical Staffing's argument. In that case, the Supreme Court of Georgia held that a defendant that deliberately waived its defense under the statute of limitation essentially committed itself to a voluntary payment and, therefore, could not seek contribution or indemnification from a co-defendant, whose own potential liability on the plaintiff's claim was barred by the statute of limitation. 246 Ga. at 411-412. In this case, the hospital was not guilty of a failure to raise such a bar to liability — it is undisputed that the Rowlands asserted the wrongful death claim against the hospital in a timely manner. Although the record does show that, in light of the indemnity agreement that applied only to claims and liabilities arising out of Howard's acts and omissions, the hospital focused its defense on minimizing the proportion of fault attributed to Ogburn, Medical Staffing identified no legal precedent that such a defense strategy constitutes a waiver of a complete defense such that the hospital's liability to the Rowlands could be deemed a voluntary payment.

(b) In addition, when Medical Staffing agreed to indemnify the hospital and hold it harmless from all claims and liabilities arising out of Howard's acts or omissions, it did not condition that obligation on the injured person also having a viable claim directly against Medical Staffing. Thus, contrary to Medical Staffing's argument, the Rowlands *can* "get through [the hospital] what [they] cannot get directly against [Medical Staffing]."

(c) Finally, Medical Staffing contends that the litigation agreement capped the hospital's liability at $100,000 and, therefore, that the maximum amount the hospital is entitled to collect against Medical Staffing is $100,000. This argument also fails. While it is true that the hospital may not *collect* from Medical Staffing more

than it (the hospital) ultimately pays the Rowlands in satisfaction of the judgment against it, it is still entitled to a judgment against Medical Staffing on its cross-claim in an identical amount to the judgment obtained against it on account of Howard's acts and omissions. *Woodall v. Beauchamp*, 142 Ga. App. 543, 545 (2) (236 SE2d 529) (1977). Based on the jury's apportionment of fault and award of damages, the hospital was entitled to judgment on its cross-claim for 95 percent of the total award.

Based on the foregoing, we conclude that the trial court did not plainly err in granting the hospital's motion for entry of judgment on its cross-claim. *Woodall v. Beauchamp*, 142 Ga. App. at 545 (2).

*Judgment affirmed. Doyle, P. J., and Miller, J., concur.*

DECIDED JANUARY 24, 2012 ▮▮▮▮▮▮

*Insley & Race, Brynda R. Insley, Aynsley M. Harrow*, for appellant.

*Bendin, Sumrall & Ladner, Timothy H. Bendin, Kristin L. Hiscutt, Cash, Krugler & Fredericks, Alwyn R. Fredericks, John G. Mabrey, James D. Summerville*, for appellees.