# WHOLE COURT

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**July 16, 2013**

# In the Court of Appeals of Georgia

A13A0383.  LEXINGTON   INSURANCE   COMPANY   v.
ROWLAND et al.

ELLINGTON, Presiding Judge.

In this case, the following circumstances exist and are dispositive of the appeal:

(1) The evidence supports the judgment;

(2) No reversible error of law appears and an opinion would have no precedential value;

(3) The judgment of the court below adequately explains the decision; and

(4) The issues are controlled adversely to the appellant for the reasons and authority given in the appellees' brief.

The judgment of the court below therefore is affirmed in accordance with Court of Appeals Rule 36.

*Judgment affirmed. Phipps, C. J., Barnes, P. J. and Miller, J., concur. Andrews, P. J., Ray and Branch, JJ. dissent.*

A13A0383.  LEXINGTON  INSURANCE  COMPANY  v. ROWLAND et al.

BRANCH, Judge, dissenting.

In this case's first appearance before this Court, we affirmed a jury's verdict and a trial court's judgment awarding nearly $4 million to the widow and estate of William Rowland, who died as a proximate result of the negligence of employees of Dekalb Medical Center and Medical Staffing. See *Medical Staffing Network, Inc. v. Connors*, 313 Ga. App. 645, 646-650 (722 SE2d 370) (2012) (cert. denied, May 29, 2012). The question presented in this appeal is whether the trial court properly granted summary judgment to plaintiffs in their declaratory action against Lexington Insurance Company concerning Lexington's provision of excess liability coverage to Medical Staffing, which was held 95% liable for plaintiffs' losses. Medical Staffing was self-insured to the extent of $1 million and carried a $5 million policy issued by Lexington. Because I conclude that the trial court erred when it granted

summary judgment to Medical Staffing as to its duty to cooperate with Lexington and as to Lexington's waiver of defenses to coverage, I respectfully dissent.

A jury found in favor of the Rowlands and against DeKalb Medical Center and Medical Staffing in the amount of $1,364,279.40 for William Rowland's medical bills and his pain and suffering. The jury found in favor of Janet Rowland, and against DeKalb Medical only, in the amount of $2.5 million on her wrongful death claim. The jury also found that DeKalb Medical's employee was 5 percent at fault for William Rowland's injuries and death, while an employee of Medical Staffing, Peggy Howard, was 95 percent at fault. See *Medical Staffing*, supra at 646-647.

The parties entered into settlement negotiations immediately after the jury's verdict, during which negotiations Medical Staffing disclosed that it would likely be filing for bankruptcy. On March 18, 2010, Medical Staffing agreed to pay the $737,852.93 balance of its self-insured retention; on March 19, the parties agreed to settle the suit for $1,150,000, with DeKalb Medical paying $100,000 and Medical Staffing contributing the rest.[1] On June 2, 2010, the Rowlands executed the

---

[1] Because Medical Staffing's self-insured retention ($1 million less expenses incurred in investigating and defending the Rowlands' claim) was then $787,852.93, the settlement required Lexington to pay $262,147.07 (including $130,685.15 to discharge a Medicare lien).

2

settlement agreement. Less than two weeks later, on June 15, 2010, Medical Staffing informed the Rowlands that, because of its insolvency and impending bankruptcy, it would not fulfill its obligations under the settlement agreement. The following day, Lexington notified Medical Staffing that its failure to honor the settlement agreement could result in a loss of coverage. Lexington then tendered two checks to the Rowlands totaling $262,147.07, or Lexington's portion of the amount due under the settlement agreement.

The Rowlands never deposited Lexington's checks. Instead, on June 18, 2010, the Rowlands moved to rescind the settlement agreement based on Medical Staffing's failure to contribute its share of the settlement. Three days later, on June 21, 2010, Lexington notified Medical Staffing that Lexington was terminating coverage based, inter alia, on Medical Staffing's failure to perform the settlement agreement. See *Medical Staffing*, supra at 650-651 (3). Medical Staffing then filed for bankruptcy and moved the bankruptcy court for permission to continue to pay its self-insured retention amounts, as well as other insurance obligations, as "imperative" to its ongoing business credibility. On July 7, 2010, the bankruptcy judge authorized Medical Staffing to pay, "in [its] reasonable business judgment," any self-insured retention claims "to the extent they may become due and payable according to the

3

terms of such policies." Medical Staffing never paid any part of its $1 million self-insured retention or any other amount to either DeKalb Medical or the Rowlands, however. Instead, on November 18, 2010, and after it had stopped paying its own defense costs in the Rowlands' underlying action, Medical Staffing signed an agreement under which Lexington assumed Medical Staffing's defense without waiving Lexington's right to disclaim coverage.

In the wake of the settlement's collapse, the trial court granted DeKalb Medical's cross-claim against Medical Staffing for indemnity (on the theory that Medical Staffing was Dekalb Medical's agent as to the negligence causing William Rowland's death) and thus entered judgment against Medical Staffing in the total principal amount of almost $3.75 million. The Rowlands then filed this action seeking a declaratory judgment as to Lexington's obligation to pay the $3.75 million judgment against Medical Staffing, less Medical Staffing's $1 million self-retention amount.[2] Both parties moved for summary judgment on the question of whether

---

[2] Although the matter is hardly plain from the trial court's final order, the parties apparently agree that Lexington has never been under any responsibility, even faced with Medical Staffing's insolvency, to "drop down" and pay the first $1 million of the latter's liability. "The description of an excess insurer's coverage as beginning when the insured or the primary insurer had either paid or been held liable to pay the limits of the underlying policy has not generally required the excess insurer to drop down to replace the coverage of an insolvent primary insurer, although there is

4

Medical Staffing's refusal to honor the settlement agreement allowed Lexington to limit or terminate coverage for the Rowlands' claim. After a hearing, the trial court granted the Rowlands' motion and denied Lexington's motion.

On appeal, Lexington asserts that the trial court erred when it (1) held Lexington responsible for that portion of the judgment assessed against DeKalb Medical Center; (2) concluded that Medical Staffing had not breached the policy's consent and cooperation clauses; and (3) concluded that Lexington had waived its right to disclaim coverage.

The parties agree that Lexington issued the policy in February 2009 and delivered it to Medical Staffing in Florida. See *Gen. Elec. Credit Corp. v. Home Indemnity Co.*, 168 Ga. App. 344, 350 (2) (b) (309 SE2d 152) (1983) ("[An] insurance contract is constructively made at the place where the contract is delivered."). In the absence of any a choice-of-law provision in the policy itself, then, and as the parties also agree, the trial court properly considered Florida law to construe the language of the policy. Id. at 352 (b) (applying Alabama law to strike down a provision limiting the time for actions on a contract delivered in Alabama).

---

limited authority to the contrary." Couch on Insurance, § 6:38 (3d ed., database updated Dec. 2012), and cases cited.

5

Specifically, because questions as to an insurer's defenses to coverage, including any waiver of such defenses, concern the parties' obligations under an insurance policy, they are "substantive issues" governed by the law of the state in which the policy was delivered – here, Florida. See *State Farm Fire & Cas. Co. v. Mills Plumbing Co.*, 152 Ga. App. 531, 537 (2) (263 SE2d 270) (1979).

1. Although I agree with the majority's implicit conclusion that Medical Staffing did not refuse its consent to the settlement, I believe that issues of fact remain as to (a) whether Lexington properly terminated coverage due to Medical Staffing's failure to cooperate with Lexington in reaching and implementing the settlement and (b) whether Lexington waived its right to disclaim coverage.

(a) To support their argument that Medical Staffing had no choice but to refuse to pay its self-insured retention, the Rowlands point to testimony by Lexington's own spokesperson that "the chief restructuring officer" (CRO) for Medical Staffing, Loughlin Meghi & Co., " would not allow those funds to be released" in the wake of the bankruptcy. As Lexington points out, however, the contract retaining Loughlin Meghi provided that as CRO for Medical Staffing, Loughlin Meghi was obligated to "consult with and obtain input from the appropriate members of senior management" of Medical Staffing, with all acts undertaken "subject to the direction, review, and

authority" of Medical Staffing. It is also undisputed that the settlement, which had reduced Lexington's exposure from nearly $ 4 million to approximately $262,000, collapsed as an immediate and direct result of Medical Staffing's decision not to pay nearly $788,000 of the $ 1,150,000 amount due under the settlement agreement. Indeed, the trial court rescinded the agreement on this very ground. See *Medical Staffing*, supra at 651 (3).

Under Florida law, an insured is under an obligation to conduct settlement negotiations with a plaintiff in good faith for the purpose of minimizing both the insured's and the insurer's liabilities.

> Only that failure which constitutes a material breach and substantially prejudices the rights of the insurer in defense of the cause will release the insurer of its obligation to pay. The question of whether the failure to cooperate is so substantially prejudicial as to release the insurance company of its obligation is ordinarily a question of fact, but under some circumstances, particularly where the facts are admitted, it may well be a question of law.

*Bontempo v. State Farm Mut. Ins. Co.*, 604 So. 2d 28, 29 (Fla. App. 1992). This record shows that Medical Staffing requested and obtained permission from the bankruptcy judge to pay its self-insured retention amount for the purpose of maintaining its credibility as a business, and then decided shortly afterward not to

make any such payments to the Rowlands or anyone else. Because this record supports a reasonable conclusion that Medical Staffing's decision not to pay its lion's share of the settlement was taken in the exercise of its business judgment, the question of whether this decision amounted to a "failure to cooperate" must be left for a jury to consider under Florida law. See *Ramos v. Northwestern Mut. Ins. Co.*, 325 So. 2d 87, 89 (Fla. App. 1975) (jury properly determined that an insured breached his duty to cooperate with insurer), aff'd, 336 So. 2d 71 (Fla. 1976).

(b) Under Florida law, "engaging in negotiations looking toward a possible settlement" of a loss or claim cannot "be deemed to constitute a waiver of any provision of a policy or of any defense of the insurer thereunder." Fla. Stat. Ann. § 627.426 (1), (1) (c); see also OCGA § 33-24-40 (3). Likewise, Florida courts define "waiver" as "the intentional relinquishment or abandonment of a known right or privilege, or conduct that warrants an inference of the intentional relinquishment of a known right." (Citation and punctuation omitted.) *Hale v. Dept. of Revenue*, 973 So.2d 518, 522 (Fla. App. 2007).

> The crux of the waiver doctrine rests upon conduct demonstrating an intent to relinquish a known right. If a party relies upon the other party's conduct to imply a waiver, the conduct relied upon to do so must make

8

out a clear case of waiver. Waiver does not arise merely from forbearance for a reasonable time.

(Citations and punctuation omitted.) Id. at 522-523.

The Rowlands' assertion that Lexington waived coverage as a result of its actions during and immediately after the apparent collapse of the settlement agreement runs afoul of these principles. It is undisputed that Lexington advised all parties during the settlement that it would not "drop down" and pay Medical Staffing's self-insured amount; that on the day after Medical Staffing repudiated the settlement agreement in June 2010, Lexington notified Medical Staffing that such repudiation endangered its excess coverage; and that Medical Staffing agreed in writing some months afterward that in exchange for Lexington's defense, Lexington would not be held to have waived any defenses to coverage. Given these undisputed facts, I believe that summary judgment should have been granted to Lexington on this issue.

For these reasons, I respectfully dissent. I am authorized to state that Andrews, P. J., and Ray, J., join in this dissent.