**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and MCMILLIAN, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**June 18, 2014**

# In the Court of Appeals of Georgia

A14A0355. PROGRESSIVE ELECTRICAL SERVICES, INC. et al.
        v. TASK FORCE CONSTRUCTION, INC.

MCMILLIAN, Judge.

Progressive Electrical Services, Inc. ("Progressive") and Timmy L. Bush appeal the trial court's grant of summary judgment and award of attorney fees in an action filed against them by Task Force Construction, Inc. ("TFC") asserting claims of breach of contract and indemnification. For the reasons set forth below, we affirm the grant of summary judgment.

We review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant. *Miller v. City Views at Rosa Burney Park GP, LLC*, 323 Ga. App. 590, 591 (746 SE2d 710) (2013). Viewed in that light, the record shows that on or about April 29, 2009, Bush executed a "Subcontract

Agreement" with TFC (the "Agreement") on behalf of Progressive. Under the Agreement, Progressive was to provide labor, tools, equipment and insurance necessary to furnish and install an electrical package for the project known as the Sudie A. Fulford Community Learning Center in Swainsboro, Georgia (the "Project").

Although Bush ostensibly signed the Agreement in his representative capacity as the president of Progressive, the Agreement contained the following provision designed to bind him in his individual capacity to its terms (the "Signature Provision"):

> **Signing Individual**. Each and every individual who signs this [Agreement] or any Attachment or exhibit thereto on behalf of [Progressive] hereby warrants and agrees that such individual is duly authorized 1) to act on behalf of [Progressive]; 2) to enter this [Agreement] on behalf of [Progressive]; and 3) to bind [Progressive] to the terms of [the Agreement]. *Each and every individual signing on behalf of [Progressive] also further agrees that, notwithstanding anything contained herein or on any signature line to the contrary, each such individual signing on behalf of [Progressive], in addition to signing in a representative capacity, is also signing [the Agreement] in his or her personal and individual capacity and each such individual signing on behalf of [Progressive], by signing below, hereby individually and personally agrees to be bound by all of the obligations*

2

*of [Progressive]* in [the Agreement] (including, but not limited to, the Attachments hereto).

(Emphasis supplied.)

The Agreement provided that Progressive was to be paid $275,000 for completion of its services, subject to any valid written change orders. Under the Agreement, TFC could make changes to the work to be performed and the materials to be furnished through a written change order signed by both parties, but no changes were valid "except upon written Change Order from [TFC] and signed by authorized representatives of [TFC and Progressive]." The Agreement further expressly provided that

> [TFC] shall not be liable to [Progressive] for any additional cost of management, supervision, labor, materials, supplies, equipment, tools, machinery, plant, services, engineering and testing without such written Change Order. No officer, employee or agent of [TFC] is authorized to direct any changed or extra work by oral order. Only written approval from [TFC's] President, Larry Sailors, or such Project Manager as [TFC] may specifically designate in writing as having authority to make change orders, can authorize changes.

Additionally, Progressive agreed to pay promptly any costs for material or labor furnished by third parties on the Project. In connection with its work on the electrical package, Progressive entered into a separate contract with Hagemeyer North America, Inc. ("Hagemeyer") for the purchase of materials, and Hagemeyer supplied materials to Progressive under that contract. For reasons that are unclear, TFC ultimately paid Progressive only $245,250 in connection with the Project, and Progressive failed to pay Hagemeyer approximately $120,200 due and owing for materials supplied. Hagemeyer brought suit to recover the amounts owing under its contract with Progressive, naming Progressive, TFC, and Great American Insurance Company ("GAIC"), the surety on the Project's payment bond (the "Payment Bond"), as defendants. GAIC ultimately settled the suit with Hagemeyer for $116,000, and TFC, as principal on the Payment Bond, reimbursed GAIC in the amount of $118,463.69 (the "Payment"), which included reimbursement of GAIC's attorney fees and costs.

Under the Agreement, Progressive agreed to indemnify TFC

from all claims, losses, fines, penalties, assessments and damages (including by not limited to reasonable attorney's fees) arising out of[, inter alia, Progressive's] breach of any term [of the Agreement], including costs, investigation expenses, expert expenses and attorney's

4

fees incurred by [TFC] in the investigation and defense of such claims or allegations. TFC relies upon this provision in seeking to recover the amount it paid to GAIC, less any amounts TFC owes to Progressive under the Agreement, as amended by any valid change orders. The trial court granted TFC's subsequent motion for summary judgment against Progressive and Bush, jointly and severally.

1. Progressive and Bush assert that the trial court erred in awarding damages jointly and severally against Bush because he did not sign the Agreement in his individual capacity. Bush signed the Agreement on the signature line for the Subcontractor, as follows:

SUBCONTRACTOR: Progressive Electric

BY: Timmy Bush

Title: Pres.

None of the parties disputes that this signature was sufficient to bind Progressive to the terms of the Agreement, but Progressive and Bush dispute that Bush has any individual obligation under the contract. Moreover, they assert that because Bush's name as an alleged guarantor is not included in the Agreement and the signature block does not indicate that he was signing as an individual guarantor, the Signature Provision, which they contend is an attempt at creating a guaranty, violates the Statute of Frauds.

5

(a) Progressive and Bush are correct that a single signature in a representative capacity generally does not bind the signing party individually. In Georgia, "an agent who, acting within the scope of his authority, enters into contractual relations for a disclosed principal does not bind himself, *in the absence of an express agreement to do so*." (Citation and punctuation omitted; emphasis supplied.) *Primary Investments, LLC v. Wee Tender Care III, Inc.*, 323 Ga. App. 196, 198 (1) (746 SE2d 823) (2013). But the Signature Provision here contains such an express agreement to bind Bush individually, providing that by signing on behalf of Progressive, Bush also "individually and personally [agreed] to be bound by all of the obligations of [Progressive]" under the parties' contract, "notwithstanding anything contained [in the Agreement] or any signature line to the contrary." Accordingly, we find that under the unambiguous language of the Signature Provision, Bush's single signature bound him in his individual capacity, along with Progressive, under the Agreement. See *Gigandet v. Lighting Galleries, Inc.*, 191 Ga. App. 536, 536-537 (382 SE2d 600) (1989) (physical precedent only).[1]

---

[1] Although *Gigandet* is only physical precedent, we find it persuasive on the principle that a single signature can bind both a corporate entity and the individual signer where the language of the contract expressly so provides.

6

And although Bush and Progressive argue that such a provision creates a trap allowing for "unbridled liability to be unleashed on unsuspecting victims," this argument ignores the well-settled legal principle that a party

> has the duty to read a contract before signing it and by signing, the party is bound by its terms "unless [he] can show that an emergency existed at the time of signing that would excuse [his] failure to read it, or that the opposite party misled [him] by an artifice or device which prevented [him] from reading it, or that a fiduciary or confidential relationship existed between the parties upon which [he] relied in not reading the contract.

(Citation omitted.) *Buckner v. Buckner*, 294 Ga. 705, 708 (1) (755 SE2d 722) (2014). Bush has presented no evidence of any emergency, fraud, or confidential relationship to justify any failure on his part to read the Agreement before he signed it. The Signature Provision appears on the same page as the signature line, spaced apart from the preceding provisions of the contract, and with the heading "**Signing Individual**" in boldface type. Under these circumstances, Bush must be charged with knowledge of the Signature Provision, even if he did not read it, and he is therefore bound, individually, to the terms of the Agreement.

(b) Additionally, we find no violation of the Statute of Frauds. Under § 13-5-30 (2), "[a] promise to answer for the debt, default, or miscarriage of another" "must be

7

in writing and signed by the party to be charged." And Georgia courts have interpreted this language "to mandate . . . that a guaranty identify the debt, the principal debtor, the promisor, and the promisee." (Citations omitted.) *Dabbs v. Key Equip. Finance, Inc.*, 303 Ga. App. 570, 572 (694 SE2d 161) (2010).

But the Signature Provision in this case "does not have the characteristics of a guaranty agreement. [Bush] did not obligate [himself] to pay the debts of [Progressive], if it did not pay, or guarantee its solvency." (Emphasis omitted.) *Rankin v. Smith*, 113 Ga. App. 204, 206 (1) (147 SE2d 649) (1966). See also OCGA § 10-7-1.[2] Rather, Bush agreed to assume the same obligations that Progressive had under the Agreement, including, but not limited to, the obligation "to furnish all labor, materials, tools, equipment and insurance necessary to furnish and install a complete Electrical package" on the Project, to pay any materialmen or subcontractors promptly, and to indemnify TFC against any losses arising out of any breach by Progressive under the Agreement. Therefore, Bush is a principal to the contract, not a guarantor.

---

[2] OCGA § 10-7-1 defines a contract of suretyship or guaranty as "one whereby a person obligates himself to pay the debt of another in consideration of a benefit flowing to the surety or in consideration of credit or indulgence or other benefit given to his principal, the principal in either instance remaining bound therefor."

8

Even though TFC's complaint in this case sought repayment of amounts it claims are owing under the Agreement, those claims do not arise from any debt Progressive owes for money or credit extended by TFC to Progressive. Rather, any liability on Bush's part arises from his individual, direct obligation to indemnify TFC for payments TFC made to a third party, GAIC, arising out of Progressive's breach of the Agreement. "An indemnity contract differs from a guaranty in that the former is an original rather than a collateral undertaking and generally undertakes to make good the promisee's loss resulting from his liability to another rather than from another's liability to him." (Citations and punctuation omitted.) *Thomasson v. Pineco, Inc.*, 173 Ga. App. 794, 794 (328 SE2d 410) (1985). See also *Rankin*, 113 Ga. App. at 207 (1). Contracts of indemnity generally fall outside the Statute of Frauds. *Copeland v. Belville*, 93 Ga. App. 442, 443 (1) (92 SE2d 54) (1956). Therefore, we hold that the Signature Provision is enforceable against Bush.

2. Progressive and Bush next assert that summary judgment was inappropriate because the record demonstrates issues of material fact and conflicts in the evidence.

(a) Progressive and Bush argue that a conflict in the evidence exists as to the amount TFC owes Progressive under the Agreement, thereby creating an issue for a jury.

It is undisputed that the original contract price under the Agreement was $275,000, and the Agreement provides that any changes to the work to be performed required a written change order signed by both parties and that TFC would not be liable to pay any additional amounts for work or materials in the absence of such a change order. The trial court found that the Agreement price increased to $287,184 based on what the court found to be the only valid change order in the record. The trial court states that the change order was dated February 24, 2010, and was attached as an exhibit to Bush's deposition. But, although the record before us contains that deposition, it does not contain the deposition exhibits.

"On appeal, the burden is on the appealing party to show error affirmatively by the record. When that burden is not met, the judgment in issue is assumed to be correct and must be affirmed. When an appellant fails to include evidence considered by the court on summary judgment, that omission is generally fatal." (Citations omitted.) *Ligon v. Lumpkin County*, 261 Ga. App. 435, 435 (582 SE2d 504) (2003). Because crucial evidence was omitted from the record, Progressive and Bush have not met their burden of showing error affirmatively by the record. *White v. Arthur Enterprises, Inc.*, 219 Ga. App. 124, 125 (2) (464 SE2d 225) (1995). See also *In re Estate of Dorroh*, 255 Ga. App. 366, 367 (565 SE2d 565) (2002). In the absence of

10

all the evidence considered by the trial court, we must assume that the trial court was correct in determining that the evidence contained only one valid change order and that it properly calculated the amount of damages based on that change order. Id.

Additionally, we note that in asserting that issues of fact remain as to damages, Progressive and Bush rely only upon a copy of a Progressive billing statement submitted to TFC in the amount of $301,665.15, which was attached to their interrogatory responses. Pretermitting whether this document can be considered as evidence on summary judgment, we note that it is a billing statement unsigned by either party and thus cannot be considered a valid change order. Moreover, Bush testified in his deposition that Progressive performed work that TFC did not approve by valid change orders, and it is possible that the $301,665.15 could include amounts Progressive was seeking to recover for such unapproved work. Because the Agreement specifically provides that TFC is not liable for any unapproved work, we find that the billing statement, even if it could be considered evidence, would be insufficient to create a factual issue for the jury on the amount of damages.

(b) Bush and Progressive next argue that issues of fact remain as to liability because TFC breached the Agreement by admittedly failing to pay Progressive all

11

amounts due and owing thereunder, thereby causing Progressive's breach in failing to pay Hagemeyer.

Under Georgia law, "[i]f the nonperformance of a party to a contract is caused by the conduct of the opposite party, such conduct shall excuse the other party from performance." OCGA § 13-4-23. Thus, pretermitting which party was the first to breach the contract, in order "to constitute a defense to this action, [Progressive's] nonperformance must have been caused by conduct of [TFC] which made [Progressive's] performance useless or impossible. Nothing in this record, however, raises the issue that [TFC] made [Progressive's] performance useless or impossible." (Citations omitted.) *Ott v. Vineville Mkt., Ltd.*, 203 Ga. App. 80, 80 (1) (416 SE2d 362) (1992).

To the contrary, Bush admitted in his deposition that even if TFC had paid Progressive the full amount it claimed, $301,665.15, Progressive nevertheless would have been unable to pay the full amount it owed to Hagemeyer. Progressive contended that TFC still owed it $56,000 under the Agreement, but Bush admitted that Progressive owed Hagemeyer over $120,000. And the trial court found that Progressive was actually entitled to over $14,000 less than it claimed. Progressive has presented no evidence or argument to explain how TFC's failure to pay caused

12

Progressive to breach the Agreement as to the difference between what it was entitled to receive from TFC and what it still owed Hagemeyer. Because the trial court's damage award credits Progressive with the amount that it determined TFC owed Progressive, only the amount of that difference is at issue. Accordingly, we find that no material questions of fact remain on the question of whether Progressive is liable because TFC's underpayment allegedly caused the breach.

(c) Progressive and Bush next assert that summary judgment was inappropriate because an issue of fact remains as to whether TFC paid GAIC the amount it claims. They argue that TFC failed to produce evidence showing the amount that it reimbursed to GAIC under the Payment Bond. This argument is without merit.

As TFC notes, Progressive and Bush admitted the fact and amount of the payment below. In its brief in opposition to the motion for summary judgment, Progressive asserted that TFC "paid GAIC $118,463.69 without an action being filed." Bush adopted that assertion into his own brief in opposition to the motion "as if restated [therein] verbatim." "It is well established that a party may make admissions in judicio in their pleadings, motions, and briefs. What a party admits to be true in its pleadings may not subsequently be denied. The factual admissions in judicio made by [Progressive and TFC] in their brief[s] are therefore binding.

(Citations and punctuation omitted.) *American Arbitration Assn. v. Bowen*, 322 Ga. App. 51, 54 (1) (743 SE2d 612) (2013).

(d) Progressive and Bush further assert that an issue of fact remains as to whether Hagemeyer's release and dismissal with prejudice of Progressive in the prior lawsuit somehow resulted in the release of Progressive and Bush from any liability to TFC. We disagree.

Although Progressive and Bush make assertions regarding pleadings and procedural matters in the underlying Hagemeyer lawsuit, they fail to point us to any admissible evidence of such matters in the appellate record.[3] Hagemeyer apparently filed its suit in the Superior Court of Fulton County, and TFC filed this suit in the Superior Court of Henry County. "A trial court cannot take judicial notice of pleadings and orders of other courts of this State . . . because such issues are a matter of proof that cannot be judicially noticed." *Nationsbank, N. A. (South) v. Tucker,* 231 Ga. App. 622, 623 (1) (a) (500 SE2d 378) (1998). See also *Fitzpatrick v. Harrison*,

___

[3] Although the trial court issued the order in this case in July 2013, the motion and the parties' briefing were filed in 2012 before the effective date of Georgia's new Evidence Code. The record does not reflect that any hearing was held on the motion. Accordingly, Georgia's former Evidence Code applies in this case. See *Morrow v. Angkawijana, LLC*, __ Ga. App. __, n. 6 (755 SE2d 561) (2014). See also Ga. L. 2011, pp. 99, 214 § 101.

300 Ga. App. 672, 673 (686 SE2d 322) (2009). Rather, "[c]ertified copies of such pleadings would have to be tendered . . . and received as . . . evidence." *Nationsbank*, 231 Ga. App. at 623 (1) (a). Therefore, because Progressive and Bush failed to provide certified copies of the pleadings, we cannot properly consider them on motion for summary judgment.

But even if we were to consider the pleadings cited by Progressive and Bush, we find that their argument on this ground has no merit. In arguing that TFC's claims have been released, Progressive and Bush rely upon OCGA § 13-4-80, which provides that "[w]hen a creditor releases another who is bound jointly with or primarily to a debtor or accepts from a debtor a higher security for the *same debt*, not intended to be collateral thereto, a release results by operation of law." (Emphasis supplied.) Id. But that statute has no application in this case. Even if we consider Progressive, TFC, and GAIC to have been jointly and severally liable on Progressive's debt to Hagemeyer on open account, Hagemeyer's dismissal of Progressive with prejudice does not affect the independent liability of Progressive and Bush to indemnify TFC under the Agreement. Cf. *Marchman & Sons, Inc. v. Nelson*, 251 Ga. 475, 477-478 (306 SE2d 290) (1983) ("the right of contribution arises out of, but exists separately from, the rights present in the underlying suit"); *Greenhorne &*

15

*O'Mara, Inc. v. City of Atlanta*, 298 Ga. App. 261, 262 (679 SE2d 818) (2009) ("[c]ontribution claims are separate and distinct from the claims asserted in the underlying litigation, and they are not extinguished by release, dismissal, or judgment in the underlying litigation and are not barred by failure to assert them in the underlying litigation") (citation and punctuation omitted). See also *State Farm Fire & Cas. Co. v. American Hardware Mut. Ins. Co.*, 224 Ga. App. 789, 794 (4) (a) (482 SE2d 714) (1997) ("[t]he principles set forth in *Marchman* are equally applicable to claims of indemnity").

(e) Progressive and Bush also argue that TFC's payment to its bonding company on the debt from which Hagemeyer had released Progressive in the prior lawsuit somehow bars TFC from recovering against them because TFC failed to appear and assert its indemnification claims in the underlying lawsuit. We find no merit to this argument.

TFC was not required to assert its claim for indemnification in the underlying Hagemeyer lawsuit. See *Scott v. Rakestraw*, 252 Ga. App. 408, 410 (1) (556 SE2d 492) (2001) (claim for contribution does not have to be brought as either a counterclaim or a cross-claim to the original action, but instead may be brought by filing a separate action after judgment has been entered in the original tort action);

16

*Tenneco Oil Co. v. Templin*, 201 Ga. App. 30, 33 (1) (410 SE2d 154) (1991) (Georgia law treats a claim that has not yet accrued as permissive, and not "as a *compulsory counterclaim*") (emphasis in original); *Carr v. Nodvin*, 178 Ga. App. 228, 233 (3) (342 SE2d 698) (1986) (indemnity claim does not accrue until funds are expended relating to such claim). Thus, we find that any arguments that TFC's failure to assert such a claim in the Hagemeyer action somehow relieves Progressive and Bush of any liability for indemnification under the theories of res judicata, collateral estoppel, waiver, or otherwise are without merit. See, e. g., *Greenehorne*, 298 Ga. App. at 262; *State Farm Fire*, 224 Ga. App. at 794 (1) (a) (failure to cross-claim for indemnification does not bar claim under res judicata).

(f) Progressive and Bush also assert that the record presents issues of material fact as to whether any recovery by TFC is barred under the doctrine of voluntary payment set out in OCGA § 13-1-13. The trial court found that the voluntary payment doctrine, "[a]s a practical matter" did not apply in this case because it was not a case "where one party is trying to recover money that it paid *to* the party that is raising the defense of voluntary payment." (Emphasis in original.) But even if the doctrine did apply, the trial court found that Bush and Progressive had not "pointed to anything in the record that indicates that [TFC's] payment was made to [GAIC] for any reason

17

other than the bond provided by [GAIC] required it." Although we disagree with the trial court's reasoning in this regard, we find that it properly granted summary judgment to TFC on this issue.

Under OCGA § 13-1-13, a person cannot recover money voluntarily paid, unless one of the conditions listed in the statute is met (e.g., mistake of fact, fraud, or an urgent and immediate necessity).[4] And "[t]he party seeking to recover payment bears the burden of showing that the voluntary payment doctrine does not apply." (Citation and punctuation omitted.) *Southern Mut. Church Ins. Co. v. ARS Mechanical, LLC*, 306 Ga. App. 748, 751 (1) (703 SE2d 363) (2010). See also *Energy & Process Corp. v. Jim Dally & Assocs., Inc.*, 291 Ga. App. 772, 775 (1) (662 SE2d 835) (2008). Thus, "[t]echnically, the doctrine is not a defense . . . , [and] the

---

[4] The statute provides:

[payments of claims made through ignorance of the law or where all the facts are known and there is no misplaced confidence and no artifice, deception, or fraudulent practice used by the other party are deemed voluntary and cannot be recovered unless made under an urgent and immediate necessity therefor or to release person or property from detention or to prevent an immediate seizure of person or property.

OCGA § 13-1-13.

18

presumption is that all payments are voluntary" unless the payor proves otherwise. (Citations omitted.) John K. Larkins, Jr., Ga. Contracts Law and Litigation § 10.18 (2d ed., updated October 2013). Accordingly, the trial court erred to the extent that it placed the burden on Progressive and Bush to show that the Payment was made for some reason other than that the bond required it.

Additionally, we find that the application of the voluntary payment doctrine is not limited to situations "where one party is trying to recover money that it paid *to* the party that is raising the defense of voluntary payment" as the trial court found.[5] This Court has previously applied the voluntary payment doctrine in cases in which the

---

[5] We note that in *Read v. Benedict*, 200 Ga. App. 4, 9 (4) (406 SE2d 488) (1991), this Court held, without citation to any authority, that the voluntary payment doctrine did not apply "so as to preclude the award of *damages* in a suit grounded in *tort* when the alleged voluntary payment involved was to a third party not involved in a suit for the purpose of satisfying a claim caused . . . ." (Emphasis in original.) Pretermitting whether *Read* is a correct statement of law in the tort context, it is not binding in this contract case. Additionally, in *Hibbard v. McMillan*, 284 Ga. App. 753, 756 (2) (645 SE2d 356) (2007), which involved payments pursuant to contract, this Court stated that "[t]he doctrine generally bars the recovery of *excess* payments, not payments made to a third party who is not involved in the litigation." (Citations omitted and emphasis in original.) *Hibbard* cites only to *Read* in support of this statement, without any analysis regarding the application of that opinion in a contract case. Accordingly, given the use of the word "generally," the *Hibbard* statement must be interpreted as merely a recognition that most applications of the voluntary payment doctrine occur in the context of overpayment between the parties to the suit, and not as a holding that it can never apply in a case involving a payment to a third party. Therefore, we find that *Hibbard* does not compel a different result in this case.

19

payor sought to recover payments made on behalf of someone else to third parties, who were not parties to the litigation, including cases in which the payor is seeking to recover on a theory of indemnity. See, e.g., *Southern Mutual*, 306 Ga. App. at 752-753 (1); *Insurance Co. of North America v. Kyla, Inc.*, 193 Ga. App. 555, 556 (388 SE2d 530) (1989). See also Larkins, Ga. Contracts Law and Litigation § 10.18.

Moreover, we find that in the context of indemnity, the voluntary payment doctrine can be interpreted as merely a corollary to the "quintessential element" of an indemnity claim, which requires proof of "the legal compulsion to pay on the part of one seeking [indemnity]." *GAF Corp. v. Tolar Constr. Co.*, 246 Ga. 411, 412 (271 SE2d 811) (1980). In other words, an indemnitee bears the burden of showing that it was legally required to make the payment for which indemnification is sought as part of its claim. And, in fact, Georgia courts have denied recovery in indemnity cases where the payor has failed to show that the payment was legally necessary, even without the express application of the voluntary payment doctrine. See, e.g. *Emergency Professionals of Atlanta, P.C. v. Watson*, 288 Ga. App. 473, 475-476 (1) (654 SE2d 434) (2007); *Benton v. Gaudry*, 230 Ga. App. 373, 376 (3) (496 SE2d 507) (1998). Cf. *Southern Nitrogen Co. v. Stevens Shipping Co.*, 114 Ga. App. 581, 586 (1) (151 SE2d 916) (1966) (pre-Civil Practice Act case dismissing complaint where

20

plaintiff failed to plead a legal obligation to make payment for which it sought indemnification). Thus, to recover against Progressive and Bush, TFC must show that the Payment was legally necessary (i.e., that the Payment was not voluntary).

TFC alleged in its complaint that it made the Payment in response to GAIC's threat of litigation after GAIC provided a written demand "outlining that [TFC] and its shareholders were responsible for indemnifying [GAIC] for all amounts paid to Hagemeyer under the [Payment] Bond, including attorney's fees and costs of litigation," and it repeated that assertion in its brief in support of the motion for summary judgment. But no copy of that written demand appears in the record. On appeal, TFC argues that it had legal duties under the terms of the Payment Bond and under Georgia law to make the Payment.

We have reviewed the terms of the Payment Bond, however, and find nothing in the four corners of that document binding TFC to indemnify GAIC for any amounts paid thereunder, and TFC has failed to point us to any such provision in the bond. Rather, the Payment Bond provides that TFC and GAIC are bound jointly and severally to the Board of Regents of the University System of Georgia, the owner of and obligee on the bond, and this Court has previously held that a payment bond containing terms similar to the Payment Bond in this case "did not create any liability,

21

contingent or otherwise, as between the principal and the surety." *Goodyear Tire & Rubber Co. v. New Amsterdam Cas. Co.*, 101 Ga. App. 577, 578 (2) (114 SE2d 546) (1960). We conclude, therefore, that TFC had no legal obligation under the Payment Bond itself to reimburse GAIC for the full amount of the settlement with GAIC, plus attorney fees and costs.

TFC also asserts that it had a legal obligation to GAIC under OCGA § 10-7-56, which provides that "[a] surety who has paid the debt of his principal shall be subrogated, both at law and in equity, to all the rights of the creditor and, in a controversy with other creditors, shall rank in dignity the same as the creditor whose claim he paid." But TFC fails to explain how that statute creates an obligation between a principal and surety. See *Fabian v. Dykes*, 214 Ga. App. 792, 794 (449 SE2d 305) (1994) (on motion for reconsideration) ("subrogation by which a guarantor . . . takes rights of the creditor [under OCGA § 10-7-56] is not the same thing as a guarantor's right to recoup payment of a debt from his principal), overruled in part on other grounds, *Continental Ins. Co. v. State Farm Mut. Ins. Co.*, 212 Ga. App. 839, 841-842 (1) (443 SE2d 509) (1994). Accordingly, we fail to see how OCGA § 10-7-56 imposes a legal requirement for TFC to pay GAIC.

22

Nevertheless, GAIC had the statutory right to recoup payment, including attorney fees and costs, from TFC under OCGA § 10-7-41.[6] "Even a voluntary payment by the guarantor entitles him to proceed against the principal," *Fabian*, 214 Ga. App. at 793, and a creditor's prior release of the principal does not affect this right. Id. Although TFC inexplicably fails to cite to OCGA § 10-7-41, it is clear that under that statute, the Payment was made out of legal necessity and thus was not voluntary.

Accordingly, the trial court's reasoning was erroneous, but its order granting summary judgment to TFC was proper. "Unless the record is so poorly developed as to make legal analysis impossible, a trial court's grant of summary judgment that is right for any reason will be affirmed." *Chapman v. C. C. Dickson Co.*, 273 Ga. App. 640, 641 (1) (616 SE2d 478) (2005). See also *Abellera v. Williamson*, 274 Ga. 324, 326-327 (2) (553 SE2d 806) (2001). We, therefore, affirm the trial court's grant of summary judgment to TFC on the issue of the voluntary payment doctrine.[7]

---

[6] That statute provides that "[p]ayment by a surety or endorser of a debt past due shall entitle him to proceed immediately against his principal for the sum paid, with interest thereon, and all legal costs to which he may have been subjected by the default of his principal." OCGA § 10-7-41.

[7] TFC's "Motion For Frivolous Appeal and Damages for Appeal Taken for Delay Only" is hereby denied.

*Judgment affirmed. Phipps, C. J., and Ellington, P. J., concur.*