[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-14160
_____

D.C. Docket No. 1:17-cv-01721-SCJ


EMORY UNIVERSITY, INC.,
d.b.a. Emory University Hospital,
THE EMORY CLINIC, INC.,

                                        Plaintiffs-Appellants,

versus

NEUROCARE, INC.,

                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(January 25, 2021)

Before WILSON, NEWSOM, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

We consider two discrete issues under Georgia law pertaining to an indemnification obligation arising from a tragic death at a sleep disorder treatment and diagnostics lab. Emory University, Inc. ("Emory University") seeks indemnification from Neurocare, Inc. ("Neurocare"), the lab services provider whose technologists were found by a jury to be 60 percent at fault for the death of Brandon Harris. The first issue is whether Emory University is entitled to indemnification from Neurocare for this 60 percent liability incurred due to the negligence of Neurocare's technologists. Emory University asserts this right to indemnity pursuant to the services contract as an "affiliate" of its wholly, indirectly owned grandchild corporation, the express indemnitee and the hospital, Wesley Woods Center of Emory University, Inc. ("Wesley Woods"). The second issue is whether Emory University, even if it would otherwise be entitled to contractual or common law indemnification, is barred from indemnity because it failed to assert its distinct and separate corporate existence as a defense to liability in the underlying wrongful death action. This second issue requires us to consider a line of Georgia case law holding that indemnification is barred if the would-be indemnitee had, but failed to assert, in the underlying suit a "defense available which would have defeated the action." GAF Corp. v. Tolar Constr. Co., 246 Ga. 411, 411, 271 S.E.2d 811, 812 (1980) (citation omitted).

2

After careful review, and with the benefit of oral argument, we vacate the district court's grant of summary judgment in Neurocare's favor and remand. We conclude that Emory University is an "affiliate" of Wesley Woods, and that the indemnification bar doctrine does not operate in the unique facts of this case.

## I. BACKGROUND

A. <u>The Parties, the Agreement, and the Amendment</u>

A group of entities bearing the "Emory" name provided sleep disorder diagnostic and treatment services. The most superior entity is Emory University, which wholly owns and controls Emory Healthcare, Inc., which, in turn, wholly owns and controls Wesley Woods. Emory University also wholly owns and controls The Emory Clinic, Inc. (the "Emory Clinic"). Emory University Hospital is an operating division of Emory University.

In June 2005, Emory University entered into a Sleep Diagnostic Services Agreement (the "Agreement") with Neurocare. Neurocare doing business as the Center for Sleep Diagnostics, defined as "CONTRACTOR," agreed "to provide certain sleep diagnostic services to and under the direction of HOSPITAL," defined as Emory University doing business as Emory University Hospital. Neurocare agreed to operate the Emory Sleep Lab located at Emory University Hospital by, among other things, staffing technologists to conduct sleep studies,

educating and training physicians and staff regarding the sleep lab, and preparing sleep reports for physicians' analysis.

> Section 9.1 of the Agreement is an indemnification provision that reads,

> CONTRACTOR agrees to indemnify, defend, save and hold harmless forever HOSPITAL, its subsidiaries and affiliates, successors and assigns, and its officers, directors, trustees, employees and agents from and against any and all liability, loss, damage, claim, cause of action, cost or expense (including reasonable attorney's fees actually incurred and Court costs), that is caused directly or indirectly by or as a result of any intentional or negligent act or omission to act by CONTRACTOR or its agents or employees providing service pursuant to this Agreement. This section shall survive any expiration or termination of this Agreement.

Section 9.3 reserves the right of each party to seek any common law indemnification or contribution, in addition to the contractual basis in Section 9.1.

> In May 2006, the parties executed an amendment to the Agreement (the "Amendment," and together with the Agreement, the "Amended Agreement") in light of the Emory Sleep Lab moving from Emory University Hospital to Wesley Woods. The Amendment states,

> [T]he contracting party in the Agreement, stated as "Emory University, Inc., d/b/a Emory University Hospital ("HOSPITAL") and the Emory Clinic, Inc. ("CLINIC")", is hereby deleted and replaced with the following language: "Wesley Woods Center of Emory University, Inc. d/b/a Wesley Woods Geriatric Hospital ("HOSPITAL") and the Emory Clinic, Inc. ("CLINIC") and Emory University, Inc. d/b/a Emory University Hospital ("EMORY").

4

The Amendment also states, "In the event of a conflict between the terms of this Amendment and the terms of the Agreement, the terms of this Amendment shall govern. Except as set forth in this Amendment, all other provisions of the Agreement shall remain unchanged and in full force and effect."

The effect of the Amendment was as follows. The HOSPITAL—which was the named indemnitee in the original Agreement—was Emory University doing business as Emory University Hospital. When the Emory Sleep Lab was moved from Emory University Hospital to Wesley Woods Geriatric Hospital, the Amendment substituted Wesley Woods as the HOSPITAL. Thus, the named indemnitee of the indemnification obligation in the Amended Agreement became Wesley Woods. This meant that the Amended Agreement now provided that Neurocare, which remained the CONTRACTOR and indemnitor, was obligated to provide indemnification for Wesley Woods and its "subsidiaries and affiliates, successors and assigns, and its officers, directors, trustees, employees and agents," for the same sorts of losses as in the original Agreement—those "caused directly or indirectly by or as a result of any intentional or negligent act or omission to act by" Neurocare "or its agents or employees providing service."

B. The Underlying State Court Wrongful Death Action

In April 2011, several of the "Emory" entities and Neurocare were sued by the administratrix of the estate of Brandon Harris in state court in DeKalb County,

5

Georgia, for the alleged wrongful death of Mr. Harris during a sleep study at the Emory Sleep Lab in January 2010. In particular, the defendants included Wesley Woods doing business as Emory School of Medicine, the Emory Clinic, the Emory Sleep Center, and Neurocare and its sleep technologists that worked in the lab, as well as other entities and individuals, such as lab doctors.

This state case proceeded to trial in September 2015 but not before certain parties were dismissed or otherwise removed from the case. Primarily, Emory University entered the case on behalf of Wesley Woods and the other "Emory" entities, except for the Emory Clinic. It is undisputed that, despite not being formally dismissed, Wesley Woods had been replaced at trial by Emory University, its grandparent corporation—that is, the corporation that wholly owned and controlled Wesley Woods's parent corporation, which wholly owned and controlled Wesley Woods. It is undisputed that Emory University did not draw the distinction between itself and Wesley Woods at trial. Emory University says it proceeded as such as part of a trial strategy—i.e., in light of the well-known "Emory" name and the potential for a negative reaction from jurors who might not look favorably on Emory University's using its separate corporate form as a way to avoid responsibility for the death.

6

In addition, Neurocare settled with the plaintiff before trial and, despite not being formally dismissed as defendants, Neurocare and its sleep technologists did not appear at or participate in trial and were considered to be nonparties.

On September 25, 2015, the jury returned a verdict in favor of the plaintiff. The jury, in part, apportioned 60 percent of the fault to "Neurocare/sleep technologists" as "nonparties."[1]  The jury also indicated on the verdict form: "We find Emory liable for the negligence if any, of Neurocare/sleep technologists."

In light of the jury verdict, the trial court entered judgment, which read in relevant part,

> The jury further assessed fault against Nonparties Neurocare/sleep technologists and assigned fault of 60% . . . .
>
> By special interrogatory, the jury found Defendant Emory University, Inc., d/b/a Emory University Hospital liable for the negligence of the Nonparties Neurocare/sleep technologists.
>
> Pursuant to the jury's allocation of fault, judgment is entered in favor of the Plaintiff . . . and against Emory University, Inc., d/b/a/ Emory University Hospital in the amount of $12,305,570.64, together with post-judgment interest in the respective amount and court costs.

After this judgment was entered, Emory University and the Emory Clinic settled with the plaintiff.  The trial court entered a consent order dismissing with

---

[1]    The verdict form also allocated fault to others not at issue in this appeal.  It indicated that one percent of fault was attributed to a doctor, and 39 percent of fault was attributed to "Emergency medical technicians" as "nonparties."

7

prejudice the state plaintiff's claims against Emory University doing business as Emory University Hospital, the Emory Clinic, and the remaining doctor defendants.

While post-trial motions were briefed and filed, Emory University and the Emory Clinic filed crossclaims against Neurocare to recover for the settlement payment, including claims for contractual and common law indemnification. The claims were voluntarily dismissed without prejudice on May 2, 2017.

C. Proceedings Before the District Court

Emory University and the Emory Clinic filed suit against Neurocare in federal district court on May 12, 2017. The complaint included Emory University's claims for contractual and common law indemnification. Emory University alleged that its indemnification rights were triggered because the settlement payment with the plaintiff in the underlying suit was made due to the judgment against it, and the judgment was based solely on "the derivative and active negligence of Neurocare and its employee sleep technologists." The complaint also included an attorney's fees and expenses claim.

The parties filed cross-motions for summary judgment. Neurocare sought summary judgment arguing, inter alia, that Emory University was not entitled to indemnity because it is not an "affiliate" of Wesley Woods; and even if it were, the indemnification bar doctrine applies because Emory University failed to assert its

8

enterprise liability defense—i.e., its defense that its separate corporate status shielded it from the vicarious liability, which Wesley Woods incurred on the basis of its ultimate authority and control of the Emory Sleep Lab and its technologist.[2]

The district court denied Emory University and the Emory Clinic's motion and granted Neurocare's motion, entering judgment in its favor.[3]  Relying on Emergency Professionals of Atlanta, P.C. v. Watson, 288 Ga. App. 473, 654 S.E.2d 434 (2007), and U.S. Lawns, Inc. v. Cutting Edge Landscaping, LLC, 311 Ga. App. 674, 716 S.E.2d 779 (2011), the district court concluded that Emory University had failed to present evidence indicating that it would have still been held liable in the underlying state case had it asserted a so-called "enterprise

---

[2]    All parties on appeal assume that Emory University's liability flows through the vicarious liability of Wesley Woods for the 60 percent liability at issue.  See Appellants' Br. at 27 (describing "the central question in this case" as "whether Emory University's decision to undertake Wesley Woods' liability was a legitimate 'defense strategy' that prevents the operation of the Indemnification Bar"); Appellee's Br. at 41 ("Emory University's contractual indemnification claim hinges on whether it was Wesley Woods's 'affiliate' under the Amended [Agreement]."), 49–50 ("As it concedes, Emory University decided not to recognize the formal distinction between it and Wesley Woods for purposes of the defense of this matter, which in turn, allowed Emory University (not Wesley Woods) to be exposed to liability. . . . In this way, Emory University's liability arose out of its own decision to ignore its corporate form, not from any negligence of Neurocare." (citation omitted) (internal quotation marks omitted)).

[3]    The district court also entered summary judgment against the Emory Clinic on the Emory Clinic's breach of contract claim based on a Medical Director Agreement between Neurocare and the Emory Clinic, which allegedly required Neurocare to maintain professional liability insurance for one of the lab doctors who was also an underlying defendant.  The Emory Clinic does not challenge this decision.  Any such claim by the Emory Clinic is deemed abandoned. See Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004) ("[A] legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").

liability defense," embracing its distinct corporate existence from, and lack of responsibility for the actions of, Wesley Woods. Thus, assuming it had otherwise established a right to indemnity, Emory University could not recover for indemnification based on the underlying liability because a valid defense to liability existed that had not been asserted. Emory University timely appealed.

## II. DISCUSSION

Emory University argues it is entitled to indemnification and that the so-called "indemnification bar" does not operate against it. This requires us to consider (A) whether Emory University has a contractual right to indemnity as an "affiliate" in the Amended Agreement, and (B) whether the indemnification bar doctrine precludes indemnification.

### A. Emory University is an "Affiliate" of Wesley Woods

Section 9.1 of the Agreement and the Amendment provide that Neurocare "agrees to indemnify" Wesley Woods and its "affiliates" for liability and losses "caused directly or indirectly by or as a result of any intentional or negligent act or omission to act by" Neurocare. The parties dispute whether Emory University's relationship with Wesley Woods makes Emory University an "affiliate" under the Agreement, as read with the Amendment, requiring indemnification.

It is undisputed that the word "affiliate" is not defined in the Amended Agreement and that Georgia law governs its interpretation. "Under Georgia law,

10

words in a contract generally bear their usual and common meaning and the usual and common meaning of a word may be supplied by common dictionaries." King v. GenOn Energy Holdings, Inc., 323 Ga. App. 451, 455, 747 S.E.2d 15, 17 (2013) (quoting Global Ship Sys. v. Cont'l Cas. Co., 292 Ga. App. 214, 215–216(1), 663 S.E.2d 826 (2008)); see Ga. Code Ann. § 13-2-2(2) ("Words generally bear their usual and common signification . . . ."); see, e.g., Salinas v. Atlanta Gas Light Co., 347 Ga. App. 480, 483, 819 S.E.2d 903, 906 (2018) ("[T]he arbitration clause at issue expressly applied to GNG and its 'affiliates,' but affiliate is not defined therein. We therefore look for the 'usual and common signification' of the word." (quoting Ga. Code Ann. § 13-2-2 (2))).

The Black's Law Dictionary definition of "affiliate" has been adopted by the Georgia Court of Appeals as supplying the usual and common meaning of the term. See King, 323 Ga. App. at 455, 747 S.E.2d at 18; Harkins v. CA 14th Inv'rs, Ltd., 247 Ga. App. 549, 550, 544 S.E.2d 744, 746 (2001). Black's Law Dictionary defined "affiliate" at the time the Agreement and Amendment were executed as a "corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." Affiliate, Black's Law Dictionary (8th ed. 2004). The definition is the same in the current version of the Dictionary. See Affiliate, Black's Law Dictionary (11th ed. 2019). In particular, in King v. GenOn Energy Holdings, Inc., the Georgia Court of Appeals found that

11

the usual and common meaning of "affiliate" was supplied by the same definition, then in the seventh edition of Black's Law Dictionary, and held that there was an affiliate relationship between a company and another, of which it owned 50 percent. 323 Ga. App. at 455, 747 S.E.2d at 18. "The two companies were thus related, associated and in close connection based on this common ownership." Id.

Even clearer than in King, the relationship at issue in our case clearly fits the Black's Law Dictionary definition of affiliate: Emory University owns 100 percent of the entity that owns 100 percent of Wesley Woods. Thus, Black's Law Dictionary's requirement of a relationship by way of "shareholdings or other means of control" covers Emory University's full ownership and control of Wesley Woods. Indeed, the express reference to "parent," when read with the shareholding and control aspects of the definition, quite clearly includes the grandparent-grandchild relationship at issue. Emory University is, therefore, Wesley Woods's affiliate.

Any further ambiguity in the term "affiliate," as Neurocare argues is present, is not with respect to the relationship in this case and is not a reason to impart any alternate meaning than the one in Black's Law Dictionary and King. Specifically, Neurocare cites Salinas v. Atlanta Gas Light Co., a case in which the Georgia Court of Appeals found the term—with respect to an indirect corporate relationship—to be ambiguous in light of 20 varying definitions in the Georgia

Code and differences among the Black's Law Dictionary definition and other courts' interpretations.  347 Ga. App. 480, 483, 819 S.E.2d 903, 906 (2018).  The Salinas court held that Atlanta Gas Light Company and Georgia Natural Gas were not affiliates.  Id. at 485, 819 S.E.2d at 908.  AGL Resources Inc. owned 100 percent of both Atlanta Gas Light and Georgia Natural Gas Company, which in turn owned 85 percent of Georgia Natural Gas.  Id. at 484, 819 S.E.2d at 907.  This indirect relationship between Atlanta Gas Light and Georgia Natural Gas was insufficient as compared to a sibling relationship, said the court, which would have brought the relationship within available definitions.  Id.  Given the ambiguity, the contract had to be construed against the drafting party, which required adopting a reading of the term "affiliate" that excluded Atlanta Gas Light.

Importantly, the Salinas court distinguished King by stating it was a case in which the Georgia Court of Appeals "found the meaning of 'affiliate' unambiguous in [a] certain setting[]" and was distinguishable because it addressed whether "the term 'affiliate' applied to a parent corporation and a corporation owned in part by a subsidiary of the parent corporation, i.e., a grandchild corporation."  Id. at 484 n.4, 819 S.E.2d at 907 n.4 (citing King, 323 Ga. App. at 455, 747 S.E.2d at 18).  Thus, in distinguishing King, Salinas emphasized that "affiliate" is not ambiguous as to grandparent-grandchild corporate relationships and more generally when considering a direct lineage of ownership and control.

13

Salinas, therefore, only further supports the conclusion that Emory University is an affiliate.

Indeed, when read together, King and Salinas and the definitions examined in those cases are united in their treatment of a relationship like the one between Emory University and Wesley Woods. Both cases looked to Black's Law Dictionary, which clearly indicates a grandparent is an affiliate of a grandchild. And while the Salinas found ambiguity due to various other definitions of the term, those definitions largely support the same conclusion that Emory University is Wesley Woods's affiliate. That is, in each of the definitions that the Salinas court examined, an affiliate included an entity exercising sufficient direct or indirect ownership or control over the other entity. See Salinas, 347 Ga. App. at 483–84, 819 S.E.2d at 906–07 ("[Ga. Code Ann.] §§ 7-1-4 (a corporation or similar organization is an 'affiliate' of a financial institution if, inter alia, the financial institution controls the election of a majority of directors, trustees, or other persons exercising similar functions at the corporation, or where the financial institution or its shareholders own or control 50 percent of the shares of the corporation, or where the corporation owns or controls 50 percent of the financial institution); 14-2-1110 (1) ('"Affiliate" means a person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with a specified person.'); 18-2-71(1) (B) ('Affiliate' has multiple definitions, including

14

'[a] corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote by the debtor or a person who directly or indirectly owns, controls, or holds with power to vote 20 percent or more of the outstanding voting securities of the debtor[.] . . .')."").  The other definitions of "affiliate" in the Georgia Code referenced, but not examined or quoted, in Salinas also support the holding that the control and ownership of the type in this case makes Emory University an affiliate of Wesley Woods.  In fact, nearly all use virtually the same language in defining an affiliate as an entity or person that "controls, is controlled by, or is under common control" or is "controlling, controlled by, or under common control" with another, sometimes specifying that either direct or indirect control can qualify.[4]  Thus, even using the same definitions as the Salinas court, we must conclude there is no ambiguity in the term with respect to Emory University's inclusion.[5]

---

[4]      See Ga. Code Ann. §§ 3-6-21.3(a)(1); 7-6A-2(2); 14-2-140 (adopting by direct citation the definition in § 14-2-1110); 14-2-624 (same); 14-2-1131 (same); 33-1-25(b)(1); 33-13-1(1); 33-23-46(a)(1); 33-36-3(1); 33-38-4(2); 46-3-171(2.1); 46-4-152(1); 48-8-2; 46-3-62(1). Another definition, not using this common language, embodies the same ownership and control concepts.  See id. § 26-4-119(c)(1) (defining "affiliate" in a pharmacy statute as a person which, "either directly or indirectly through one or more intermediaries," has "an investment or ownership interest in a pharmacy," "[s]hares common ownership with a pharmacy," or has "as an investor or ownership interest holder a pharmacy").

[5]      The out-of-jurisdiction cases cited in Salinas do not create ambiguity in the meaning of the term "affiliate" requiring a construction that would exclude Emory University.  See 347 Ga. App. at 484, 819 S.E.2d at 907.

Neurocare's argument that Emory University is not an affiliate because the meaning of the term is "a subordinate, subsidiary, or member," or "closely associated with another typically in a dependent or subordinate position," is unpersuasive and contradicted by the weight of the authorities. First, the plain language of the Amended Agreement contemplates the difference between "affiliates" and the terms Neurocare uses by distinguishing and separating "subsidiaries" from "affiliates" of Wesley Woods as eligible for indemnification. Next, Neurocare quotes definitions from the American Heritage and Merriam-Webster dictionaries in support of the argument that an affiliate is a subordinate, but we are not writing on a clean slate with the term "affiliate" in Georgia. The term has been the subject of several Georgia opinions, which have never used the narrower definitions Neurocare cites to exclude a grandparent corporation. Indeed, the Georgia Court of Appeals has only referenced Black's Law Dictionary in determining the meaning of the term "affiliate," not any other dictionary. See King, 323 Ga. App. at 455, 747 S.E.2d at 18 (citing Black's Law Dictionary's definition of "affiliate" and no other dictionary); Salinas, 347 Ga. App. at 484, 819 S.E.2d at 907 (same); Harkins, 247 Ga. App. at 550, 544 S.E.2d at 746 (same). Furthermore, the Georgia Code's various definitions of the term almost always include a "two-way" definition by defining an affiliate as either an entity that (a)

16

"controls" another or (b) "is controlled by" another.  See Salinas, 347 Ga. App. at 483–84, 819 S.E.2d at 906–07; supra note 4.

In addition, other courts, including our predecessor court, have rejected similar "one-way" or "downstream" definitions of "affiliate" that exclude the corporate parent or superior entities.  See Braun v. Ins. Co. of N. Am., 488 F.2d 1066, 1067 (5th Cir. 1974) ("[T]he appellant contends that affiliate cannot refer to an associate with a superior status.  Alleging the existence of ambiguity regarding the use of the word affiliate, the appellant asserts that the Court must construe the contract provision most favorably to the assured. . . .  We neither accept the appellant's viewpoint that the policy provision was ambiguous nor adopt the appellant's restrictive downstream definition of the word affiliate."); Securus Techs. Inc. v. Glob. Tel*Link Corp., 676 F. App'x 996, 999 (Fed. Cir. 2017) ("Securus further contends that the plain, ordinary, and generally accepted meaning of 'affiliate' does not include a corporate parent. . . .  That argument does not stand up against a review of the authorities pertinent to the [relevant contract], . . . [including] the contemporaneous edition of Black's Law Dictionary . . . .").

In sum, the term "affiliate" in Section 9.1 of the Agreement embodies the term's well-established common meaning.  That common meaning includes a superior, grandparent corporation.  In light of Emory University's direct control and entire ownership of Wesley Woods's parent, which directly controls and owns

17

Wesley Woods, Emory University is Wesley Woods's affiliate.  And because

Emory University was found liable due to the fault of Neurocare, Emory

University has a right to indemnity pursuant to the Amended Agreement.[6]

   B.  The Indemnification Bar Does Not Apply Here

The district court allowed Neurocare to avoid its indemnification

obligation—pursuant to both the Amended Agreement and the common law—

because Emory University did not assert its "enterprise liability" defense in the

underlying litigation.  Emory University concedes that, as a distinct corporate

entity from Wesley Woods, it could have avoided liability with this defense, but as

part of a litigation strategy, it did not assert the defense.  However, Emory

University's assertion of the defense would have protected only Emory University;

it would not have protected Wesley Woods and, most significantly, it would not

---

[6]    Although also challenged by Neurocare, Emory University has established a common law indemnification claim because the underlying state judgment was entered against it as a result of the negligence of Neurocare and its agents.  See Cutting Edge, 311 Ga. App. at 676, 716 S.E.2d at 782–83 ("The duty to indemnify may arise by operation of law, independently of contract.  If a person is compelled to pay damages because of negligence imputed to him as the result of a tort committed by another, he may maintain an action for indemnity against the person whose wrong has thus been imputed to him." (quoting Nguyen v. Lumbermens Mut. Cas. Co., 261 Ga. App. 553, 557(2), 583 S.E.2d 220 (2003))).  In light of our conclusion with respect to contractual indemnity, we need not discuss common law indemnity in more detail.  However, with respect to the claims for both common law and contractual indemnification, we reject Neurocare's argument that Emory University was found by the jury to be directly liable for its own negligence.  Neurocare's argument is squarely contradicted by the plain language of both the underlying jury verdict and judgment—i.e., Emory University was found liable for the negligence of Neurocare's sleep technologists.  Although the one percent fault allocated to the Emory Clinic's employee, Dr. Schulman, may have represented direct liability for his own negligent failure to supervise, that is not an issue on appeal.

have provided any protection at all for Neurocare. Because both Wesley Woods and Emory University have a right to indemnity from Neurocare, Emory University's assertion of the defense would simply have meant that Neurocare's indemnification obligation would have run to Wesley Woods instead of to Emory University for the underlying liability. Of course, we know that Wesley Woods is Neurocare's express or named indemnitee pursuant to the Amended Agreement, and it is clear that Wesley Woods would be similarly entitled to both contractual and common law indemnification, like Emory University is now. Thus, Neurocare suffered no adverse impact at all from Emory University's strategic decision to enter the case and replace Wesley Woods. Having suffered no adverse impact, Neurocare cannot in this indemnification case now claim a benefit from the strategic trial decision in the underlying case.

Under the unique circumstances of this case, we do not believe that the "indemnification bar" under Georgia law operates. The bar is a narrow exception to an otherwise proven claim for indemnification based in a string of Georgia cases, starting with GAF Corp. v. Tolar Constr. Co., 246 Ga. 411, 411, 271 S.E.2d 811, 812 (1980). Those cases hold that generally, a would-be indemnitor is not obligated to pay for liability arising from an action in which the would-be indemnitee had available to it a defense that would have eviscerated the underlying action, it having been held liable when it should not have been.

19

We read these cases as only applying to the scenario in which the underlying defense is a <u>complete</u> defense in that it would have defeated the underlying action—that is, the <u>entire</u> action and <u>any</u> liability arising therefrom for which the indemnitor would then be liable.  See <u>GAF</u>, 246 Ga. at 411, 271 S.E.2d at 812 ("[N]o indemnification or contribution can be recovered by the party cast against a third party if the party cast had a defense available which <u>would have defeated the action</u> but failed to assert it." (emphasis added) (quoting <u>Jones v. Wright</u>, 258 So.2d 195, 197–98 (La. Ct. App. 1972) ("As a <u>complete defense</u> was available to third party plaintiffs and this they failed to assert, they are not entitled to either indemnification or contribution from the third party defendants." (emphasis added)))); <u>U.S. Lawns, Inc. v. Cutting Edge Landscaping, LLC</u>, 311 Ga. App. 674, 676, 716 S.E.2d 779, 782 (2011) ("At the summary judgment stage, the relevant question is whether the evidence demands a finding that the indemnitee had a <u>defense to the underlying tort action</u> that would have <u>defeated liability</u>." (emphasis added)); <u>Emergency Pros. of Atlanta, P.C. v. Watson</u>, 288 Ga. App. 473, 476, 654 S.E.2d 434, 437 (2007) ("[N]o indemnification or contribution can be recovered by the alleged tortfeasor from a third party if the alleged tortfeasor had a defense available which would have <u>defeated the action</u> but failed to assert it." (emphasis added)); <u>Foster v. Nix</u>, 173 Ga. App. 720, 727, 327 S.E.2d 833, 839 (1985) ("We recognize that no indemnification may be recovered if the party had a defense

20

which would have <u>defeated the action</u> but failed to assert it." (emphasis added)). The bar operates to relieve the indemnitor from payment and liability that should never have existed.

Being a limited exception to indemnification, the bar does not extend to this case—a scenario in which, had the defense in question been asserted in the underlying action to protect Emory University, Neurocare's indemnification obligation would remain, and Neurocare would remain obligated to indemnify Wesley Woods. The available defense would not have defeated the whole liability, just that of a particular defendant, Emory University. Assertion of the available defense would have had a net zero effect on the indemnitor, Neurocare. Neurocare has offered no authority for the proposition that the indemnification bar doctrine should operate in a situation where the indemnitee fails to assert a defense that would have had no effect at all on the indemnitor's obligation.

In other words, the defense which Emory University could have asserted, its enterprise liability defense, would have had absolutely no effect on Neurocare's indemnity obligation given Wesley Woods's continuing presence, even in the absence of Emory University. Therefore, Emory University's strategic move did not increase Neurocare's indemnification obligation; it remained because Neurocare's obligation to Wesley Woods remained. Nor did the move harm Neurocare by, for example, precluding it from asserting its own defense in the

underlying action to prevent a jury finding that Neurocare and its sleep technologists were at fault.

Neurocare argues that the voluntary payment doctrine, a part of an indemnification claim, requires us to focus on Emory University's voluntary assumption of the underlying litigation and voluntary payment through settlement. Neurocare cites Progressive Electrical Services, Inc. v. Task Force Construction, Inc., for the proposition that the voluntary payment doctrine is "not a defense" but rather places the burden on the party seeking indemnification to prove "a legal compulsion to pay." 327 Ga. App. 608, 618, 760 S.E.2d 621, 629 (2014) (first quoting John K. Larkins, Jr., Georgia Contracts: Law and Litigation § 10:18 (2d ed. 2013); then quoting GAF Corp., 246 Ga. at 412, 271 S.E.2d at 811) (citing Ga. Code Ann. § 13-1-13)).  In addition to the plain language of the indemnification bar case law focusing on "complete defenses" which would have "defeated the action," the purpose of indemnification and equitable considerations undermine Neurocare's interpretation of the indemnification bar in this context.

The purpose of indemnification is the "reimbursement, restitution, or compensation . . . for loss, damage, or liability in tort"; that is, indemnity ensures that payment rests with "the party who is primarily liable for reimbursement of expenditures paid to a third party for injuries resulting from a violation of a common-law duty" by that primary party.  Old Republic Nat'l Ins. Co. v. Panella,

319 Ga. App. 274, 276, 734 S.E.2d 523, 526 (2012) (footnotes omitted) (first

quoting Travelers Ins. Co. v. Ga. Power Co., 51 Ga. App. 579, 181 S.E. 111, 114

(1935); then quoting Indemnity, Black's Law Dictionary (7th ed. 1999)).  The

purpose is thus focused on avoiding unjust enrichment by way of attribution of

liability and the requirement to pay to the actual party at fault.  See Barrios v. La.

Constr. Materials Co., 465 F.2d 1157, 1167 (5th Cir. 1972) ("The basis of

[indemnification] is not freedom from negligence of the indemnitee, but the

primary fault of the indemnitor." (citation omitted)).

Georgia courts have suggested that a suit for indemnity implicates equitable

principles.  See City of Atlanta v. Benator, 310 Ga. App. 597, 608, 714 S.E.2d 109,

118 (2011) (labeling a common law indemnity claim as a claim for "equitable or

common law indemnity"); Wilson v. Dodge Trucks, Inc., 238 Ga. 636, 637, 235

S.E.2d 142, 144 (1977) (describing "the general law on contribution and

indemnity" as based in "principles of law and equity"); see also Magnum Marine

v. Kenosha Auto Transp. Corp., 481 F.2d 933, 935 (5th Cir. 1973) ("The right [to

indemnification] is equitable in nature . . . .").  These equitable principles include

restitution and unjust enrichment, the bases for indemnity.  See Panella, 319 Ga.

App. at 276, 734 S.E.2d at 526; see also Greyhound Lines, Inc. v. Cobb Cty., Ga.,

681 F.2d 1327, 1332 n.8 (11th Cir. 1982) ("[E]quity first used contribution and

indemnity to correct unjust enrichment.  For instance, a party who had been

23

required to satisfy a tort claim because his agent had injured someone could bring an action against the agent on a theory of unjust enrichment.  In this manner, justice was done between the parties.") (citing 1 George E. Palmer, The Law of Restitution § 1.5(d) (1978)); Restatement (Second) of Torts § 886B cmt. c (Am. L. Inst. 1979) ("The basis for indemnity is restitution, and the concept that one person is unjustly enriched at the expense of another when the other discharges liability that it should be his responsibility to pay.").

Furthermore, the voluntary payment doctrine, which Neurocare urges, has been analogized to section 13-1-13 of the Georgia Code (codifying a more generally applicable voluntary payment doctrine).  See Progressive Elec. Servs, Inc., 327 Ga. App at 617–18, 760 S.E.2d at 628–29.  And Georgia courts have construed section 13-1-13 "in conjunction with . . . equitable principles."  See Gulf Life Ins. Co. v. Folsom, 256 Ga. 400, 402, 349 S.E.2d 368, 370–71 (1986) (discussing section 13-1-13 in the context of a claim for money had and received, which "is founded on the equitable principle that no one ought to unjustly enrich himself at the expense of another"); D & H Const. Co. v. City of Woodstock, 284 Ga. App. 314, 316, 643 S.E.2d 826, 829 (2007) ("[T]he Supreme Court of Georgia held that the voluntary payment doctrine codified in OCGA § 13–1–13 must be read in conjunction with other equitable principles.").

With the equitable goal of indemnification to attribute the underlying liability to the proper party at fault by avoiding unjust enrichment and achieving restitution, Neurocare cannot avoid indemnification based on any voluntariness of Emory University's entry in the underlying case. If the bar applied in this case, Neurocare, not Emory University, would be unjustly enriched because Neurocare would avoid the liability for its own negligence by passing it along to Emory University, something it could not have done with Wesley Woods. The enrichment of Neurocare at the expense of Emory University is not a proper application of the indemnification bar. The bar was rooted in protection of the indemnitor from payment that could have been avoided altogether; Neurocare would not have been protected had Emory University asserted the defense at issue. Instead, Neurocare's indemnity obligation to pay would have been just shifted to an affiliate, not eliminated.

The unjust nature of the result Neurocare urges is apparent from the notable difference between the indemnification bar case law and the present case. The Georgia cases addressing the indemnification bar largely involved some carelessness on the part of the would-be indemnitee in failing to assert the available underlying defense, with adverse consequences flowing to the indemnitor. See GAF, 246 Ga. at 411, 271 S.E.2d at 812 ("[T]here is no question here of Tolar's having inadvertently waived its statute of limitation defense.");

25

Cutting Edge, 311 Ga. App. at 678, 716 S.E.2d at 784 (considering a failure to timely answer and default and subsequent settlement); Watson, 288 Ga. App. at 476, 654 S.E.2d at 437 (considering a payment made pursuant to a default judgment). In the present case, the enterprise liability defense was not asserted, not because of any carelessness on Emory University's part, but because Emory University affirmatively chose to litigate on behalf of its wholly owned and controlled subsidiary as a trial strategy. Having made the strategic decision to defend its corporate grandchild, and having imposed no adverse consequences on Neurocare, there is nothing in the case law involving indemnification or the indemnification bar doctrine, or the purposes underlying that case law, that indicates that Neurocare should be relieved of the indemnification obligation it undertook. As noted above, even if Emory University had asserted its enterprise liability defense as Neurocare urges, Neurocare nevertheless would have had the same indemnification obligation to Wesley Woods. Emory University's litigation strategy did not affect Neurocare's indemnity obligation. Cf. Med. Staffing Network, Inc. v. Connors, 313 Ga. App. 645, 652, 722 S.E.2d 370, 376 (2012) ("[T]he hospital focused its defense on minimizing the proportion of fault attributed to Ogburn, [and] Medical Staffing identified no legal precedent that such a defense strategy constitutes a waiver of a complete defense such that the hospital's liability to the Rowlands could be deemed a voluntary payment.").

26

Applying the Georgia case law to the unique facts of this case, we conclude that the indemnification bar does not bar Emory University from recovering on its indemnification claims.

## III.  CONCLUSION

For the foregoing reasons, we vacate the district court's grant of summary of summary judgment in favor of Neurocare and remand the case for further proceedings not inconsistent with this opinion.[7]

VACATED and REMANDED.

---

[7] Emory University suggests that our decision, adopting as we do the gist of Emory University's position, also means that its own cross-motion for summary judgment should be granted.  However, that issue was not adequately briefed, and we prefer that the district court address it in the first instance in the light of our decision in this appeal.  But because our decision does knock down the pillar on which the district court's decision with respect to attorney's fees rested, that decision is vacated and should be reconsidered on remand.